# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**04-1235**

SUSAN ARRINGTON, ETC.

VERSUS

ER PHYSICIANS GROUP, APMC, ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 97-4329
HONORABLE J. DAVID PAINTER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***
### ELIZABETH A. PICKETT
### JUDGE
**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Oswald A. Decuir, Elizabeth A. Pickett, Billy Howard Ezell, and James T. Genovese, Judges.

**REVERSED AND REMANDED.**

**Cooks, Judge, dissents with written reasons.**
**Decuir, Judge, dissents for reasons assigned by Cooks, Judge.**
**Ezell, Judge, concurs with written reasons.**
**Genovese, Judge, concurs in the result.**

Oliver Jackson Schrumpf
Schrumpf & Schrumpf
3801 Maplewood Dr.
Sulphur, LA 70663
Counsel for Plaintiffs/Appellants:
     Susan, Joelle and Laura Arrington

Michael Keith Prudhomme
Thomas P. Leblanc
501 Broad Street
Lake Charles, LA 70602
Counsel for Secondary Defendant/Appellant:
     Louisiana Patient's Compensation Fund Oversight Board

**Charles C. Foti, Jr.**
**Attorney General**
**J. Elliott Baker**
**Special Assistant Attorney General**
**506 E. Rutland Street**
**Covington, LA 70433**
**Counsel for Defendants/Appellees/Cross-Appellants:**
 **State of Louisiana and Galen-Med, Inc., formerly d/b/a Lake**
 **Area Medical Center**

**Benjamin W. Mount**
**Bergstedt & Mount**
**1011 Lakeshore Drive, Suite 200**
**Lake Charles, LA 70160**
**Counsel for Defendants/Appellees/Cross-Appellants:**
 **State of Louisiana and Galen-Med, Inc., formerly d/b/a Lake**
 **Area Medical Center**

PICKETT, Judge.

## HISTORY

This case was previously before the court. *Arrington v. ER Physicians Group, APMC*, 04-1235 (La.App. 3 Cir. 3/9/05), 897 So.2d 911. The sole issue raised in that appeal was the same issue raised in its companion case, *Taylor v. Clement*, 04-1069 (La.App. 3 Cir. 3/9/05), 897 So.2d 909. At that time, we applied to the Supreme Court of Louisiana for instructions on the following question of law arising in both proceedings:

> Considering the devaluation of the dollar in the thirty years since the passage of the medical malpractice act is such that the $500,000.00 limit imposed in 1975 is now, according to competent evidence, worth only $160,000.00, and considering that Section 22 of Article I of the Louisiana Constitution of 1974 provides Louisiana citizens with an "adequate remedy" under our law, is the limitation on recovery for general damages of $500,000.00 imposed by the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, et seq., still considered constitutional?

*Taylor*, 897 So.2d at 911.

The Louisiana Supreme Court denied our request for certification. *Arrington v. ER Physicians Group, APMC*, 05-1059 (La. 6/17/05), 904 So.2d 708, *Taylor v. Clement*, 05-1057 (La. 6/17/05), 904 So.2d 708, and remanded the cases so that we could consider the plaintiffs' appeals.

## APPEAL

The plaintiffs herein, Susan, Joelle and Laura Arrington, appeal a judgment of the trial court denying their motion for summary judgment seeking to have the limitations on recovery for damages imposed by the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, et seq, declared unconstitutional and granting the motion

1

for summary judgment filed by the defendant, GALEN-MED, INC. , upholding the

constitutionally of the limitation on recovery or "cap" provisions of the act.

**FACTS**

The proceedings which led up to this appeal are detailed by the trial judge in

his written reasons for judgment:

> On October 28, 1994, WILLIAM ARRINGTON died at the LAKE AREA MEDICAL CENTER.
>
> On June 23, 1997, plaintiff filed an instant lawsuit alleging DR. RICHARD SAMUDIA, ER PHYSICIANS GROUP, A.P.M.C., GALEN-MED., INC., d/b/a LAKE AREA MEDICAL CENTER, and related entities were all liable for the death of WILLIAM ARRINGTON. This lawsuit was filed after a Medical Review Panel had rendered an opinion adverse to DR. SAMUDIA in accordance with Section 40:1299.47 of the Louisiana Medical Malpractice Act (La. R.S. 40:1299.41, *et seq*[)].
>
> On June 16, 1999, this court approved the settlement of the plaintiff's claim against DR. SAMUDIA for $100,000.00 pursuant to the MMA which limited DR. SAMUDIA's liability to $100,000.00. [Section 40: 1299.42(B)]. Additionally, under Section 40:1299.44(C), the payment of $100,000.00 on behalf of DR. SAMUDIA resulted in an admission of the liability of DR. SAMUDIA.
>
> On August 15, 2000, this court approved the settlement of the plaintiff's claim with the LOUISIANA PATIENT'S COMPENSATION FUND OVERSIGHT BOARD for the sum of $500,000.00, paid from the LOUISIANA PATIENT'S COMPENSATION FUND, pursuant to the Louisiana Medical Malpractice Act. The $500,000.00 sum represented $390,000.00 principal plus $90,000.00 legal interest, plus $20,000.00 expenses. In consideration of the payment of $500,000.00, the plaintiffs fully released DR. SAMUDIA, THE LOUISIANA PATIENT'S COMPENSATION FUND, THE LOUISIANA PATIENT'S COMPENSATION FUND OVERSIGHT BOARD and EVANSTON INSURANCE COMPANY, and all related parties. The plaintiffs specifically reserved all rights and causes of action against defendant, GALEN-MED, INC. D/b/a, LAKE AREA MEDICAL CENTER, while reserving its non-medical malpractice cause of action against E.R. PHYSICIAN'S GROUP and ST. PAUL FIRE AND MARINE INSURANCE COMPANY.

2

Plaintiff seeks to have the limitation of liability provided at Section 40:1299.4 2(B) declared unconstitutional and recover their damages without limitation from GALEN-MED, INC. GALEN-MED, INC. seeks to have its' [sic] liability limited to amounts paid by others.

The trial judge, after considering the issues raised by the plaintiffs, the counter-arguments of the defendants, and the law and jurisprudence, and even though finding the plaintiffs lacked an adequate remedy, upheld the constitutionality of "the cap" and issued judgment accordingly. This appeal followed.

## LAW AND DISCUSSION

The sole issue raised in this appeal is the same issue raised in *Taylor v. Clement*, 04-1069 (La.App. 3 Cir. 3/9/05), 897 So.2d 909, *certification denied*, 05-1057 (La. 6/17/05), 904 So.2d 708, also decided this day, *Taylor v. Clement*, 04-1069 (La.App. 3 Cir. 8/__/06), ___ So.2d ___, i.e., the constitutionality of the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, et seq.

## LAW AND DISCUSSION

As we undertake our consideration of the issue, we are reminded of the thoughts of one of our most revered civilian scholars, the late Justice Albert Tate, Jr., upon whom C. A. Marvin relied in a recent law review article:

> Our basically civilian tradition has been partly overlaid and replaced by Anglo-American common law. . . .

> Today, despite the renewed importance of the civilian sources of our substantive law, there is little support in the Louisiana bench and bar for the civilian theory that the role of the judges is to decide cases only, leaving doctrinal development to the scholarly writers. . . .

> The Louisiana judge, like his common-law brother, is a law-announcer as well as a case-decider. . . .

> As with the common-law judge, he views himself not merely as a technician but also as a scholar, law-maker and exponent of doctrine.

3

However, as with a modern day civilian judge, he is essentially more free than his common law counterpart from the mechanical effects of "binding" precedent; he has the freedom to return, independent of intervening judicial precedents, to the initial legislative concepts and use creative analogies and constructs based upon them; or, in the absence of legislation expressly intended to apply, he is free to devise socially just and sound rules to regulate the unprovided-for case.

Justice Tate noted that even in other states, a judge is less bound by precedent when deciding an issue of constitutional, rather than jurisdictional or statutory, law.

C. A. Marvin, *Dissents in Louisiana: Civility Among Civilians?*, 58 La.L.Rev. 975, 977 (1998) (footnote omitted) (alteration in original).

In his Written Reasons For Judgment, the learned trial judge stated:

In 1975 the Louisiana Legislature enacted the Medical Malpractice Act in an effort to combat the rising costs of health care in this state. In part, the Act was designed to increase the likelihood that health care providers would carry malpractice insurance by regulating the total damage recovery of malpractice victims, thereby reducing insurance premiums. **Butler v. Flint Goodrich Hospital,** 607 So.2d 517 (La. 1992), cert. denied, sub nom., **Butler v. Medley,** 508 U.S. 909, 113 S.Ct.., 2338, 124 L.Ed2d 249, (1993); **Williams v. Kushner,** 549, So.2d 294, 307-308 (La.1989) (Dixon, C.J., dissenting); **Everett v. Goldman,** 359 So.2d 1256, 1263, (La.1978).

. . . .

The Louisiana Medical Malpractice Act severely limits the right of injured patients. In order to qualify for the Act, a patient must first go through a Medical Review Panel rather than go directly to the courts. After going through this process, they must then file a claim in the courts. The original Medical Malpractice Act as interpreted by the court provided liability once the qualified health care provider had settled with plaintiffs. The court has eroded that one benefit given to the plaintiffs by The Medical Malpractice Act by requiring that liability now be proven again as to third party fault and fault of a sole defendant. **Conner v. Stelly,** La. Supreme Court [sic] 807 So.2d 827.

These new requirements above were not contemplated in the Act which was part of the "quid pro quo" given to the plaintiffs for the diminution in value of their claims. These were done under the guise of the medical malpractice "crisis" in order to make premiums reasonable

4

and affordable for health care providers. The erosion of the only benefits to the plaintiff's "liability" being admitted against The Fund once the health care provider had settled with the patient and the fact that the "cap" amount of *$500,000.00* which was created in 1975 is now eroded to approximately *$160,000.00* in today's dollar value. [*We note that the August 15, 2003, affidavit of Dr. Michael M. Kurth, Professor of Economics at McNeese State University, Plaintiffs' Exhibit 6, states that $500,000.00 in 1975 dollars was equivalent to only $146,435.00 at the time of his affidavit.*] This means that the Act is no longer giving the equal "quid pro quo" to the plaintiff and has eroded their rights to the point where they have none.

. . . .

At the time of the enactment of legislation, perhaps even eleven years ago at the time of the **Butler** decision, the balance was imperfect. Now it is not just imperfect, there is no balance at all to a legitimately injured plaintiff who gave away their right to go after health care providers for the full amount of their injuries over $500,000.00. The balance has been weighed heavily in favor of the health care providers, their insurers, and The Patient's Compensation Fund by the two-thirds erosion in "the dollar" from 1975 to date which limits the value of the claim to one-third if its value in 1975, thereby violating the equal protection laws guaranteed by The Louisiana Constitution. Art. 1, Sec. 3 of the 1974 Louisiana Constitution.

The Louisiana Supreme Court has stated that the Louisiana Medical Malpractice Act must be strictly construed because it grants advantages to special classes in derogation of some rights available to tort victims. In *Kelty v. Brumfield*, 93-1142, pp. 8-9 (La. 2/25/94), 633 So.2d 1210, 1216, the supreme court explained:

[I]t should be noted that the MMA, and the MLSSA, were enacted to provide for a different adjustment of the conflicts of interests between private (MMA) and public (MLSSA) health care providers and their patient-claimants than was made previously by general tort law. As part of their sweeping changes, the laws impose significant limitations on the courts' power and authority to adjudicate medical negligence cases, viz., (1) a comprehensive $500,000 cap on damages; La.R.S. 40:1299.42B, 1299.39F; and (2) mandated medical review before trial. *Id.* 1299.47, 1299.39.1. See *Everett v. Goldman*, 359 So.2d 1256 (La.1978); for discussion of the Indiana law upon which the MMA and MLSSA were modelled [sic], see Kinney, Gronfein, & Gannon, Indiana's Medical Malpractice Act: Results of a Three-Year Study, 24 Ind.L.Rev. 1277

5

(1991). In the absence of any challenge to these legislative limits upon the courts' constitutional jurisdiction, we assume without deciding their validity for purposes of the present case.

Further, the MMA and the MLSSA must be strictly construed because they grant immunities or advantages to special classes in derogation of the general rights available to tort victims. *Galloway v. Baton Rouge Gen. Hosp.*, 602 So.2d 1003 (La.1992)*; Head v. Erath Gen. Hosp.*, 458 So.2d 579 (La.App. 3d Cir.1984); *Williams v. St. Paul Ins. Co.*, 419 So.2d 1302 (La.App. 4th Cir.1982). See also, *Touchard v. Williams*, 617 So.2d 885 (La.1993); *Rodriguez v. La. Med. Mut. Ins. Co.*, 618 So.2d 390 (La.1993); *Monteville v. Terrebonne Par. Con. Gov.*, 567 So.2d 1097 (La.1990); *Keelen v. State Dept. of Culture and Rec.*, 463 So.2d 1287 (La.1985). Moreover, because the cap on damages imposed by each act harshly impacts the most severely injured victims, mitigating benefits or advantages provided for them by the laws must be liberally construed, and any disparity of treatment between such claimants by either law will be given careful scrutiny; in the absence of a showing that the classification substantially furthers an important state interest, it shall be stricken or reformed as a denial of the equal protection of the laws. See *Williams v. Kushner*, 549 So.2d 294 (La.1989).

In *Twenty-First Judicial District Court v. State, Through Guste*, 563 So.2d 1185, 1188-89 (La.App. 1 Cir.), *writs denied*, 568 So.2d 1082, 568 So.2d 1088 (La.1990) the court explained the law applicable to the attack of the constitutionality of a statute as follows:

> In *Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners, and Citizens of State of Louisiana*, 529 So.2d 384, 387-388 (La.1988) appears the following:
>
> 1.  A person attacking the constitutionality of a statute of public purpose must show clearly the constitutional aim to deny the Legislature the power to enact the legislation.
>
> The legislative power of the state is vested in the Legislature. La.Const.1974, Art. III, § 1. Except as expressly provided by the constitution, no other branch of government, nor any persons holding office in one of them, may exercise the legislative power. La.Const.1974, Art. II, §§ 1 and 2. Furthermore, it is a general principle of judicial interpretation that, unlike the federal constitution,

6

a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its Legislature. In its exercise of the entire legislative power of the state, the Legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the Legislature to enact such a statute. . . . ("Except as limited by the constitution its power is plenary"); *Swift v. State*, 342 So.2d 191, 194 (La.1977) ("Unlike Congress, our State Legislature has all powers of legislation not specifically denied it by the Louisiana Constitution").

Unless the fundamental rights, privileges and immunities of a person are involved, there is a strong presumption that the Legislature in adopting a statute has acted within its constitutional powers. . . . The presumption is especially forceful in the case of statutes enacted to promote a public purpose, [. . . .]. . . . The party attacking such a statute has the burden of showing clearly that the legislation is invalid or unconstitutional, and any doubt as to the legislation's constitutionality must be resolved in its favor. . . . In an attack upon a legislative act as falling within an exception to the Legislature's otherwise plenary power, it is not enough to show that the constitutionality is fairly debatable, but, rather, it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature the power to enact the statute.
(Some citations omitted)

A review of the record shows that the plaintiffs in the matter before us carried their burden of proving that the cap contained in the Louisiana Medical Malpractice Act violates La.Const. art. 1, § 22, which assures our citizens of an adequate remedy under the law for injury to their persons.

7

In *Vanderhoff v. Beary*, 03-0912, p. 3 (La.App. 4 Cir. 8/20/03), 853 So.2d 752, 754, *writ denied*, 03-2895 (La. 1/9/04), 862 So.2d 987, our colleagues of the fourth circuit noted that:

> There are two statutory schemes that deal with medical malpractice actions in Louisiana. One is [the Louisiana Medical Malpractice Act,] the MMA, and the other is the Medical Liability for State Services Act (the "MLSSA"), La. R.S. 40:1299.39. The MLSSA applies to medical malpractice by a "state health care provider". La. R.S. 40:1299.39(A). The MMA applies to medical malpractice by health care providers to which the MLSSA is not applicable. La. R.S. 40:1299.41(A).

Both of these acts contain the same cap provision. Further, in *Engles v. City of New Orleans*, 03-692, p. 16 (La.App. 4 Cir. 2/25/04), 872 So.2d 1166, 1178, *writs denied*, 04-1432 (La. 9/24/04), 882 So.2d 1141, 04-2654 (La. 1/7/05), 891 So.2d 697, the fourth circuit stated:

> In *Conerly v. State*, 97-0871 (La.7/8/98), 714 So.2d 709, the Louisiana Supreme Court found that under La. R.S. 40:1299.39(B) of the Malpractice Liability for State Services Act ("MLSSA"), it was the legislature's intent that a claimant should not recover more than that which would be allowed under the same circumstances under the Medical Malpractice Act ("MMA"). La. R.S. 40:1299.39(F) and La. R.S. 13:5106 contain similar language.

In the case sub judice, the plaintiffs argue that the Louisiana Medical Malpractice Act cap provision violates a number of provisions of the Louisiana Constitution of 1974: (1) the "due process" and "adequate remedy" provisions of La.Const. art. 1, § 22; (2) the "separation of powers" provision of La.Const. art. 2, § 2; (3) the provisions of La.Const. art. 3, §§ 2 and 12, in that it is a "special law" granting privileges and immunities and changes the method of collecting debts and enforcing judgments; and (4) the provisions of La.Const. art. 5, § 16, in that no amendment to the constitution was ever adopted changing the original jurisdiction of

8

the district courts. Inasmuch as we find merit to the plaintiffs' "adequate remedy" argument, we pretermit discussion of all other arguments.

Louisiana Constitution Article 1, § 22 provides as follows: "All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights."

The decedent in the case sub judice, Billy Arrington, was born on May 5, 1951. He died on October 28, 1994, at the age of forty-three. Mr. Arrington left behind a wife and two minor children whose lives were severely impacted by his untimely death. The Arrington household's income went from $29,137.00 in 1993 to $9,344.00 in 1995. In 1993, Mr. Arrington earned $20,089.27, working in the dairy department of a Lake Charles supermarket. In the four years before his death, he also sold insurance on a part-time basis. During those four years, his average income from his insurance business was $1,367.00 per year. Thus, not even considering the probability of yearly increases in income, Mr. Arrington's death represented an economic loss to his family of over $470,000.00. *All damages, including economic loss, are included in the cap imposed by the MAA and the MLSSA.*

The trial judge found that *because of the depreciation of the dollar,* the $500,000.00 cap imposed in 1975 is worth only about $160,000.00 today. That conclusion is supported by the evidence. *The defendant argues that the passage of time, the devaluation of the dollar, and other relevant economic factors are irrelevant in determining whether an adequate remedy in law exists. We disagree.* As we noted earlier, Dr. Kurth, in his affidavit, valued the 1975 cap at only $146,435.00 in today's

9

dollars. Using those values one can calculate that in order to grant today's plaintiff the same relief the legislature granted to plaintiffs in 1975, the cap would have to be raised to $1,562,500.00 using the $160,000.00 value and $1,707,242.00 using Dr. Kurth's value. In either case, we find the current $500,000.00 cap fails to provide an adequate remedy to today's severely injured plaintiffs and thus, is unconstitutional under the provisions of La.Const. art. 1, § 22.

This court does not stand alone in finding the state's cap on medical malpractice damages unconstitutional. As the trial judge pointed out in his reasons for judgment, courts in other states have take similar stances:

> Other states . . . . [finding medical malpractice caps unconstitutional] are: Texas, **Lucas v. United States**, 757 S.W.2d 687 Tex. 1988), **Rose vs. Doctors Hospital**, 801 S.W.2d 841 (Tex. 1990); Alabama, **Moore v. Mobile Infirmary Association**, 592 So.2d 156 (A1a. 1991); New Hampshire, **Brannigan v. Usitalo**, 134 N.H. 50, 587 A.2d 1232 (1991); Ohio, **Morris v. Savoy**, 61 Ohio St.3d 684, 576 N.E..2d 765 (1991); Florida, **Smith v. Department of Insurance**, 506 So.2d 1080 (Fla. 1987).

*See also, In Re Knowles v. U.S.*, 544 N.W.2d 183 (S.D. 1996). In *Knowles* the court commented:

> Initially, we note that many courts have invalidated limitations on damages based on their respective state constitutions. *Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156, 158 (Ala.1991) (*citing Smith v. Dep't. of Ins.*, 507 So.2d 1080 (Fla.1987) (invalidating a damages cap on personal injury awards); *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill.2d 313, 347 N.E.2d 736 (1976); *Brannigan v. Usitalo*, 134 N.H. 50, 587 A.2d 1232 (N.H.1991); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (N.H.1980); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978); *Morris v. Savoy*, 61 Ohio St.3d 684, 576 N.E.2d 765 (1991); *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988); *Condemarin v. Univ. Hosp.*, 775 P.2d 348 (Utah 1989); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (1989) (amended by 780 P.2d 260 (Wash.1989)) (invalidating a damages cap on all personal injury actions)).

*Knowles*, 544 N.W.2d at 186.

10

Most recently, *see Ferdon v. Wisconson Patients Compensation Fund*, 2005 WI 125, 284 Wis.2d 573, 701 N.W.2d 440.

Accordingly for the reasons stated above, the judgment of the trial court is reversed and set aside. Judgment is entered in favor of the plaintiffs, Susan, Joelle and Laura Arrington, granting their motion for summary judgment and finding the $500,000.00 cap on medical malpractice damages unconstitutional as failing to provide the plaintiffs an "adequate remedy" as guaranteed under the provisions of La.Const. art. 1, § 22. The case is remanded to the trial court for the consideration of what constitutes adequate damages in this case. All costs of this appeal are assessed against defendant, Galen-Med, Inc.

**REVERSED AND REMANDED.**

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

04-1235

SUSAN ARRINGTON, ET AL

VERSUS

GALEN-MED, INC. d/b/a LAKE AREA MEDICAL CENTER and
HEALTH CARE INDEMNITY, INC.

**COOKS, J., dissents.**

I respectfully dissent from the majority opinion for several reasons. The majority, apparently searching for a legal basis on which to rest its decision, recites language in a law review article written by the late Louisiana Second Circuit Judge C.A. Marvin quoting the late Louisiana Supreme Court Justice Albert Tate. Judge Marvin's article is befittingly entitled: *Dissents in Louisiana: Civility Among Civilians?* The article discusses the thoughts of legal scholars on the value of dissenting opinions, the importance of judicial civility, and provides very entertaining examples of dissents authored by Louisiana jurists. I wondered for a time just how the majority happened upon the article in researching the issues in this case. At last, near the end of the article, Judge Marvin, as an examples of a "highly critical dissent" referenced Louisiana Supreme Court Justice Dennis' dissent in *Butler v. Flint Goodrich Hosp. of Dillard Univ.*, 607 So. 2d 517 (La. 1992), *cert. denied*, 508 U.S. 909, 113 S. Ct. 2338 (1993), and noted the following use of maritime metaphors by the Justice to characterize the majority's analysis upholding the constitutionality of the MMA's $500,000 cap:

> Like a ship in the night, with only a look and a nod in passing, the majority barely acknowledges Article I, Section 3 of our state constitution and this court's [prior] interpretations. . . while pursuing a hithertofore uncharted course. Indeed, if my colleagues meant to follow our previous interpretation of state constitutional law, as their citations indicate, they certainly fouled up their navigation. . . My colleagues. . . may have acted irresolutely because of a lack of full understanding of

the significant differences between various equal protection [levels]...of scrutiny. . . [A] majority of this court has been blinded by a dazzling array of legal talent assembled by special interest groups opposing the single catastrophically injured and disabled tort victim...[T]he interest group may have caused the court to do far-reaching harm to our state constitutional law as well as to many areas of our tort law in addition to medical malpractice.

*Id.* at 525-526, 528.

It appears the majority in this case may well have, with the same look and nod in passing, "fouled up their navigation" by failing to mention Art. I, § 3, and totally avoiding any discussion of the level of scrutiny applicable in determining the constitutionality of a legislative enactment. Reliance on Justice Tate's views, that judge's in Louisiana are freer to use creative analogies in interpreting anew legislative concepts, and are "less bound by precedent when deciding an issue of constitutional . . . law," does not save the majority's analysis from being hopelessly lost at sea. 58 La.L.Rev. 975, 977 (1998).

The fact is judges are not free to devise new rules of interpretation to avoid *existing* legislation and judicial precedent upholding the validity of statutes. In the area of constitutional law, the Louisiana Supreme Court has stated "[l]egislative enactments are clothed with the presumption of constitutionality and regularity . . . [and] [t]his presumption continues until the party challenging the act's constitutionality establishes that it contravenes some provision of the state or federal constitution." *Everett v. Goldman*, 359 So.2d 1256, 1270 (La.1978); *Johnson v. Welsh*, 334 So.2d 395 (La.1976); *Everhardt v. City of New Orleans*, 253 La. 285, 217 So.2d 400 (1968). In the interest of "doing the right thing," we simply **cannot** abandon the analytical method of review followed by our Supreme Court in *Sibley v. Board of Supr's of Louisiana*, 477 So. 2d 1094 (La.1985) (on rehearing), and later in *Butler v. Flint Goodrich Hosp.*, 607 So.2d 517 (La.1992), to achieve a more desirable

2

remedy for an admittedly disadvantaged class of injured victims.

In this case, the Plaintiffs challenged the constitutionality of the Medical Malpractice Act's $500,000 cap found in La.R.S. 40:1299.42 (B)(1) alleging, as the majority opinion correct states, that the cap "violates a number of provisions of the Louisiana Constitution of 1974: (1) the 'due process' and 'adequate remedy' provisions of the La. Const. Art. 1, § 22; (2) the 'separation of powers' provisions of La. Const. art 2, §2; (3) the provision of La. Const. Art. 3, §§ 2 and 12, in that it is a 'special law' granting privileges and immunities and changes the method of collecting debts and enforcing judgment; and (4) the provisions of La. Const. Art 5, §16, in that no amendment to the constitution was ever adopted changing the original jurisdiction of the district courts." Plaintiffs also alleged in their Fifth Amending and Supplemental Petition, under the Louisiana Constitution of 1974, the MMA's cap violates the "right to equal protection, and other rights therein guaranteed."[1] Plaintiffs are not the first to tread these waters. Other litigants have attacked the

_____

[1] In a Motion for Summary Judgment filed by Plaintiffs on June 19, 2003, they specifically stated "separation of powers and federal and state substantive due process grounds and prohibited special law grounds prohibit the 1975 legislature from directing the result of judicial decisions in this case." They also "reserve[d] other grounds of challenge for further development of evidence." In answer to Plaintiffs' Fifth Supplemental Petition and in a "Second Motion for Summary Judgment On Behalf of the State," the State urged that the district court was bound by the opinion of the Supreme Court of Louisiana in *Butler v. Flint Goodrich Hospital*, 607 So.2d 521, and *specifically stated in paragraph 7 that "La. R.S. 40:1299.42 (B)(1) and (2) does not violate state constitutional guarantees of equal protection.*" In ruling on the motions for summary judgment filed by both parties, the trial judge stated "[E]ven though there is no adequate remedy, *equal protection*, or separation of powers, in view of the erosion of 'the dollar', this court must **deny** the Motion for Summary Judgment of the Plaintiff and grant the Motion for Summary Judgment of defendants, GALEN-MED., INC. and THE STATE OF LOUISIANA on the constitutionality claim." The State argued during oral argument and in brief that Plaintiffs did not specifically include the equal protection ground in their motion for summary judgment and therefore consideration of the merits of their motion by us should be limited to the other grounds more particularly identified in the motion. I am satisfied that the equal protection issue grounded on Art. I, § 3 was before the court and considered by it in rendering a ruling in this case. The summary judgment pleadings filed by Plaintiffs was clearly enlarged by the evidence presented at the hearing and the State's own summary judgment motion placed the equal protection issue before the court. I also am unmoved by the State's argument at trial that it is somehow unfair for this court to consider Art. I, § 3 because it did not have opportunity to address the equal protection issue below. The pleadings filed by the State in response to Plaintiffs' pleadings and its motion for summary judgment clearly show the contrary is true. The State was fully apprised of the issue and sought to advance it in the pleadings and at the hearing on the motions for summary judgment.

constitutionality of the MMA's cap, and other provisions of the Act, as offending the exact constitutional provisions they direct us to reconsider in this case.

The majority does not support its decision on any of the constitutional provisions relied upon by Plaintiffs except one– Art. I, § 22's "adequate remedy" limitation. Generally, an adequate tort remedy in Louisiana includes an award not only for the medical expenses arising from the injury, but also a reasonable dollar amount for the injury itself, including any injury to the victim's non-pecuniary interests. The majority apparently concludes that Art. I, § 22's specific guarantee of "an adequate remedy" prevents a court from validating as constitutional any legislation which provides less than an adequate remedy for tort injuries. I agree with the majority that Art. I, § 22 specifically limits the legislature's power to enact laws which infringe on "every person['s]" right to "have an adequate remedy . . . for injury to him in his person . . . ." I also agree with the majority's conclusion that Plaintiffs presented sufficient expert evidence in this case to prove that the devaluation of the dollar over the passage of time coupled with other economic factors make the current MMA's $500,000 cap, exclusive of medical expenses, in today's market wantonly inadequate as a remedy for all damages sustained by catastrophically or severely injured medical malpractice victims, which damages include loss of wages and diminished earning capacity. But this finding alone by the majority, without any further analysis, does not support its sweeping conclusion that the MMA's cap on medical malpractice damages is *per se* unconstitutional because it fails to provide an adequate remedy to Plaintiffs. The Louisiana legislature has acted in other areas of the law to limit recovery of damages to all victims within a class, such as workers' compensation, and in some cases, to provide the State's tort liability shall not exceed $500,000. Further, in some instances a Plaintiff's right to recover damages *at all* is

4

barred by legislative grants of immunity from suit. *See* La.R.S. 9:2795. Employing a pure "adequacy" test, *stripped of any consideration as to whether such legislation serves a legitimate public interest*, seriously threatens the legislature's sometimes competing but equally protected power to enact laws in furtherance of the *common good* vested in it by the same Louisiana Constitution that protects Plaintiffs' right to an adequate remedy.

This also is not the first time that the courts of this state have considered the limitations found in Art. I, § 22 in determining the merits of an attack on the constitutionality of the MMA's cap. Art. I, § 22 provides:

> All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.

In *Everett*, 359 So.2d 1256, Justice Calogero, writing for the supreme court's majority, recognized that Art. I, § 22 "like the fourteenth amendment to the United States Constitution, protects fundamental interest to a greater extent than interests that are not considered of fundamental constitutional importance." According to the *Everett* majority "[f]undamental rights include such rights as free speech, voting, interstate travel and other fundamental liberties." *Id.* at 1266. When a fundamental right is affected traditional constitutional analysis requires the court to find such legislation invalid unless a "*compelling governmental interest*" exists for its enactment. The State's power also is severely limited when it seeks to create *separate or suspect* classifications such as those "involving . . . unalterable traits as race, alienage . . . religion," birth, age, sex, culture, *physical condition*, and political ideas or affiliations. *Id.* at 1266; *Sibley v. Board of Supr's of Louisiana*, 477 So. 2d 1094, 1107 (La.1985) (on rehearing). When a fundamental right or suspect classification *is not* involved, the Louisiana Supreme Court has held "the issue . . . is

5

whether the discriminatory treatment is supported by any *rational basis* reasonably related to the governmental interest sought to be advanced by it." *Everett*, at 1266. (Emphasis added). The *Everett* court declared "[t]he right of malpractice claimants to sue for damages caused them by medical professionals does not involve a fundamental constitutional right. Thus, it is to be tested by the lesser standard of rational basis." *Id.* at 1268-1269. If a medical malpractice victim's right to sue for damages is not a fundamental right, by implication and analogy, the *Everett* decision requires a finding that the victim's right to sue for "adequate" damages is not a fundamental one as well and the same rational basis test applies in judging the constitutionality of a statute affecting it *unless it creates a separate or suspect classification*. One of the stated purposes for the enactment of the MMA's provisions, especially the $500,000 limitation on the liability found in La.R.S. 40:1299.42(B)(1), is that it assures the availability of affordable malpractice insurance for healthcare providers and lowers the costs of healthcare generally for the citizens of this state. It is hardly disputable that the amount a healthcare provider is required to pay a malpractice victim affects the cost of malpractice insurance and ultimately may affect the availability and quality of healthcare in this State. Thus, the enactment of a provision limiting a healthcare provider's exposure for damages associated with his negligence in providing healthcare to patients *rationally relates* to and assures continued healthcare services for citizens of this State at a reasonable cost. As noted by Justice Dennis in *Butler*, the "rational relationship" test is similar to the federal "minimal scrutiny" test and as he astutely observed:

> Under the federal test, statutory classifications will not be declared invalid 'if any state of facts reasonably may be conceived to justify [them]'. *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S. Ct. 1101, 1105, 6 L. Ed. 393 (1961). Also, the court using minimum scrutiny is to give the greatest amount of deference to the legislature, as the constitutionality of the provision is presumed. The burden of proof rests

6

on the individual to show that no rational basis exists. Note, *Equal Protection and Medical Malpractice Damage Caps*, 28 Idaho L. Rev. 396, 404 (1991). To some scholars, this analysis is really a predetermined ruling and 'minimal' is really no scrutiny at all:

> "For example, it would be 'rational' in this sense to burn down a barn to kill a rat. Further, courts will not allow an empirically based challenged to undo a legislative classification. Even if dubious on empirical grounds, the legislation will be sustained if the legislative judgment was logically plausible. It is therefore unsurprising that nearly all legislative classifications have been sustained when courts apply this standard. Bovbjerg, Sloan and Blumstein, *Valuing Life and Limb in Tort: Scheduling 'Pain and Suffering.'* 83 N.W. L. Rev. 908, 970 (1989) (footnotes omitted)."

*Id*. at 526.

The State is allowed to discriminate against individuals by denying them an "adequate remedy" or any remedy for that matter under certain circumstances. Thus, the courts have said the State need only articulate a *rational basis* for limiting the damages recoverable by *all* medical malpractice victims. Perhaps this explains why the courts of this State heretofore have not been willing to strike down the MMA's and the MLSSA's $500,000 statutory cap based on Art 1, § 22's access to the court, due process, and adequate remedy guarantees. *Sibley I, Sibley v. Board of Sup'rs of Louisiana,* 462 So.2d 149 (La. 1985); *Everett*, 359 So.2d 1256; *Armand v. State*, 00-1457 (La.App. 1 Cir. 6/21/02), 822 So.2d 671, *writ denied*, 02-2036 (La. 11/1/02), 828 So.2d 583; *Ruiz v. Oniate*, 00-2105 (La.App. 4 Cir. 12/27/01), 806 So.2d 81; *LaMark v. NME Hospitals, Inc*. 542 So.2d 753 (La. App. 4 Cir. 1989), *writ denied*, 551 So.2d 1334 (La.1989).

Therefore, I believe the most serious challenge to the constitutionality of the Act's monetary limitation is based on the equal protection right guaranteed under Art. I, § 3, as applied to catastrophically or severely injured victims of medical malpractice. Art. I, § 3 declares:

No person shall be denied the equal protection of the law. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.

When the State provides an "adequate remedy" to some members of a class of victims but denies an "adequate remedy" to other members of the same class *because of their physical condition*, attributes, political ideas or affiliation, the State's burden to show justification for such discrimination is heightened. Legislation that allows some medical malpractice victims to receive full recovery for the injuries they sustained; but limits the recovery of other malpractice victims whose injuries exceed $500,000 clearly denies the latter group equal protection of the law. The Louisiana Supreme Court made clear in *Sibley,* 477 So.2d 1094 (on rehearing), as it attempted to do earlier in *Everett,[2]* that the rational basis test, which had been generally applied in reviewing governmental infringement of constitutionally protected rights that are not fundamental, is not the appropriate test when reviewing the right to equal protection guaranteed by Art. I, § 3 of the Louisiana Constitution. The equal protection provision limits the State's legislative power to create *separate or suspect classifications* in enacting laws. The *Sibley II* majority specifically rejected the federal multi-level scrutiny system – rational, intermediate, and strict – as "an appropriate model for interpreting and applying the protection of equal laws pledged by our state constitution." *Sibley*, 477 So.2d 1104. The supreme court held "when a law classifying individuals on the basis of *physical condition* is attacked, the

---

[2] In *Everett*, Justice Calogero as the author of the opinion stated: "But in all cases where separate classifications are at issue, 'the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment.'" *Everett* at 1266. The *Sibley II* majority, which Justice Calogero joined, expands the questions which must be asked when separate classifications are created and identifies the burden which must be carried by the parties when an attack on the constitutionality of a particular statute is asserted based on Art. 1, §3, equal protection guarantee.

8

proponent of the legislation must show that the law does not arbitrarily, capriciously, or unreasonably discriminate against the disadvantaged class by demonstrating that *the legislative classification substantially furthers a legitimate state objective*." *Id.* at 1104. (Emphasis added.)

In reviewing the discussions of the Declaration of Rights committee of the 1973 Constitutional Convention, Judge Dennis writing for the *Sibley II* majority found the committee proposed adoption of "an article raising the threshold of equal protection by prohibiting discrimination because of 'birth, race, age, sex, social origin, physical condition, or political or religious ideas." *Id.* at 1108. Thus, the *Sibley II* majority held "Article I, Section 3 commands the court to decline enforcement of a legislative classification of individuals in three different situations: (1) When the law classifies individuals by race or religious belief, *it shall be repudiated completely*; (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, *its enforcement shall be refused unless the state or other advocates of the classification shows that the classification has a reasonable basis;* (3) When the law classifies individuals on any other basis, it shall be rejected whenever the member of a disadvantaged class shows that it does not suitably further any appropriate state interest." *Id.* at 1103. (Emphasis added.)

In *Sibley II*, the Louisiana Supreme Court held that the Act's limitation in operation "classifies individuals because of their physical condition." The court further explained:

> The law on its face is designed to impose different burdens on different classes of persons according to the magnitude of damage to their physical condition. The statute creates two classes: one, a group of malpractice victims each of whom have suffered damage that would oblige a defendant under our basic law to repair it by paying in excess of 500,000 dollars; another, a class consisting of victims whose damage

9

would not require an award over this amount to make individual reparation. Victims in the former class are prevented from recovering for all their damage, while those in the latter class are allowed full recovery. Damage to the physical condition of each malpractice victim is the primary element of his being assigned to one of the two classes. Thus, the statutory classification disadvantages or discriminates against one class of individuals by reason of or because of their physical condition.

*Id.* at 1108-1109.[3]

Moreover, not only does the MMA's cap discriminate between victims in the same class, it also creates subclasses of catastrophically or severely injured victims of malpractice by limiting recovery to *one* award of $500,000. The subclasses are created depending on whether the catastrophically or severely injured patient has a spouse, minor children or parent. For example, as recognized in *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125 (WI. 7/14/ 05), 701 N.W.2d 440, 446 (WI. 2005), a single patient may recover in Louisiana the entire $500,000 while a married catastrophically injured victim must share the cap with his or her spouse and children.

The State offered no evidence in this case, as in the cases prior, to refute that the Act's limitation of recovery discriminates against catastrophically or severely injured medical malpractice victims because of their physical condition. The State simply argues in 1992 it met the constitutional burden Art. I, § 3 placed upon it in the *Butler* case by showing that this discrimination was not arbitrary, capricious and unreasonable and furthers an appropriate State purpose. The State insists that the holding in *Butler* controls our disposition of the equal protection issue raised in this case and we are obliged to follow it without further inquiry. I do not share the State's

_____

[3] The supreme court did not reach the merits of the *Sibley* constitutionality claim because it remanded the case to the district court to allow the state an opportunity to introduce evidence "to show that there is good reason for the statutory classification, that is, that the legislative classification substantially furthers a legitimate state purpose." The case, however, was settled by the parties on remand.

confidence that the supreme court holding *nearly thirteen years ago* in *Butler,* based on the facts existing at that time, forever precludes us from revisiting the constitutional issue in this case based on the present facts. As the Wisconsin Supreme Court in *Ferdon*, 701 N.W. 2d 440, 448, recognized:

> [A] statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. *A past crises does not forever render a law valid.* Over a period of time social, political and economic changes may render a statute obsolete . . . . Where changed conditions have rendered a statute unconstitutional, the basis for its abrogation by court action is clear. *It is well settle that the continued existence of facts upon which the constitutionality of legislation depends remains at all times open to judicial inquiry.*

(Emphasis added.)

Plaintiffs in this case contend the continued application of the Act's cap, which undeniably discriminates against *catastrophically* and *severely* injured victims of medical malpractice, is unconstitutional because the evidence overwhelmingly shows *today* that the legislative purpose for the discrimination is no longer being furthered and the State has failed to show that the original purpose for the Act's adoption will be undermined by affording a more equitable remedy to these victims. They also contend the benefits analysis employed by the court in *Butler* is flawed.

The *Butler* court concluded the Act's $500,000 limitation provided three benefits to the severely injured medical malpractice victim which serves as a *quid pro quo*: a reasonable alternative remedy to offset the Act's discriminatory classification which prevents this group from receiving full recovery. Justice Watson, writing for the majority, held:

> As an offset to the Act's $500,000 limitation, Louisiana now offers those most severely injured by medical malpractice three benefits: (1) greater likelihood that the offending physician or other health care provider has malpractice insurance; (2) greater assurance of collection from a solvent fund; and (3) payment of all medical care and related benefits. Compensation and full medical care for those grossly injured by medical malpractice are legitimate social interests, which are furthered

11

> by the malpractice legislation. The discrimination in the Act against those with excessive injuries is accompanied by a quid pro quo: A reasonable alternative remedy has been provided. See *Bazley*. Since the legislature's statutory solution to the medical malpractice problem furthers the state purpose of compensating victims, it is not constitutionally infirm.

*Butler*, 607 So.2d at 521.

Plaintiffs have presented empirical evidence, *which has not been refuted by the State*, to attack the "reasonable alternative remedy" analysis relied upon by the *Butler* court in finding the cap constitutional. In *Butler,* the first benefit the court recognized was that the MMA insures a greater likelihood that the offending physician or other healthcare provider has malpractice insurance. To counter this finding, Plaintiffs submitted an affidavit by Dr. Michael Kurth, an economic expert, who attested that: "There is no evidence that the caps on medical malpractice lawsuits translate into lower malpractice insurance premiums." The expert further stated that "[m]alpractice rates are more affected by the number of malpractice claims per physician in a state and the median payment on those claims, than by a few large awards." Plaintiffs also cite excerpts from the report of the *Congressional Budget Office, Government Accounting Office*, released October 1992, stating that malpractice liability reform would have little or no effect on health care costs because malpractice liability insurance premiums amount to less than one percent (1%) of total health care costs in the U.S. As recognized by the court in *Ferdon*, 701 N.W. 2d 440, 471 studies by the U.S. General Accounting Office also "have concluded that a number of factors go into whether medical malpractice premiums increase or decrease and that there is no definitive correlation between caps on noneconomic damages and lower medical malpractice premium rates." "Indeed, according to a General Accounting Office report, differences in both premiums and claims payments are affected by multiple factors in addition to damage caps, including state premium rate regulation, level of

12

competition among insurers, and interest rates and income returns that affect insurers' returns. Thus, the General Accounting Office concluded it could not determine the extent to which differences among states in premium rates and claims payments were attributable to damage caps or to additional factors. For example, Minnesota which has no caps on damages, has relatively low growth in premium rates and claim payments." *Id.* at 472. The U.S. Department of Health and Human Services found most victims of malpractice do not file a claim. In fact, *only 1.53%* of those who are injured even file a claim. There is nothing in the record before us to suggest Louisiana victims of malpractice are more litigious than the national average.

Second, the *Butler* majority expressed that the cap provided greater assurance of collection from a solvent fund. The PCF argues allowing the Plaintiffs an award in excess of the $500,000 limitation: (1) Would expose the healthcare provider to potentially unlimited financial liability, thereby fueling increased liability insurance costs, increased medical care costs, and a return to a medical care crisis sought to be avoided by the Act initially; (2) would erode the protection afforded health care providers by participation in the PCF, thereby encouraging providers to cease participation and ending the substantial benefits afforded by the Act – primarily, assurance of recovery against a solvent fund; and, (3) would encourage a system of recovery that, to its logical conclusion disfavors settlement with health care providers, because settlement forecloses potential full recovery – a position contrary to the public policy of this State that settlements are favored. Other than these foreboding and conclusionary statements, the PCF provided no evidence, expert or otherwise, to show that allowing a more equitable recovery by Louisiana victims of catastrophic injury in medical malpractice cases will compromise the solvency of the Fund or result in any

of the horrors articulated in its brief.[4]

Plaintiffs claim there are several ways to remedy the grave disparity in the treatment of severely injured victims that do not necessarily require abandonment of the cap on damages. They suggest devising a more equitable remedy for plaintiffs will not necessarily require an increase in the amount the Fund is currently obligated to pay nor will such relief threaten the solvency of the Fund. They point out that most health care providers in this State already pay premiums for $1,000,000 coverage, and Galen-Med, the provider in this case, maintained a $10,000,000 policy. They further contend simply excluding loss of wages (economic loss) from the cap's limitation and increasing the providers contribution for this *small* class of plaintiffs will substantially remedy the disparity in most cases with only a nominal, if any, increase in premiums.[5]

---

[4]The PCF's argument might explain why the Fourth Circuit Court of Appeal in *LaMark v. NME Hospital, Inc.*, 542 So.2d 753 (La.App. 4 Cir. 1989), reiterated what it stated in *Williams v. Kushner*, 524 So.2d 191, 195 (La.App. 4 Cir. 1988), *writs granted*, 526 So.2d 785 (La.1988): "[W]ith a limitation of $500,000 dollars on the total amount recoverable, the amount of the surcharge medical care providers pay to the Patient's Compensation Fund is calculated on a known risk, and the additional amount that would be required to cover limitless judgment is unnecessary. Because the cost of increased premiums could reasonably be expected to be passed on to patients, the legislature could have reasonably believe that stabilized . . . rates would retard increases in costs of medical care and would permit medical care provider to offer a full range of services without the threat of exorbitant costs of insurance coverage."

[5] The PCF Oversight Board is in a unique position to aid the court in performing its judicial responsibility to protect the constitutional rights of Louisiana citizens. The Board is charged with the duty of managing the Fund for the benefit of the victims of medical malpractice and the healthcare providers. As part of its responsibility, the Board is authorized to "[c]ollect, accumulate and maintain claims experience data from enrolled health care providers and insurance companies providing professional liability insurance coverage to health care providers in this state, in such form as may be necessary or appropriate to permit the fund to develop appropriate surcharge rates for the fund." La.R.S. 40:1299.44 (D)(2)(b)(iii). The Board has claims experience data and surcharges rates charged healthcare providers from 1975 to the present in Louisiana. The Board also is responsible for the management and administration of the Fund, including maintaining records of all monies paid out in judgment, settlement, or for future medical care to injured victims. Since all claims against qualified healthcare providers are filed or were forwarded to the PCF Oversight Board, this body should have a record of the number of claims filed for a significant period of time since enactment of the Act to the present, the estimated amount of the claims, and the disposition of the suits filed. Plaintiffs' expert testified that malpractice rates are affected by a number of factors other than claim experiences and amounts paid in a particular state. The Board is further authorized to "[e]mploy, or in accordance with the provisions of law applicable to contract for personal, professional or consulting services, retain the services of a qualified competent actuary to perform the annual actuarial study of the fund required by this Section and to advise the board on all aspects of the fund's administration, operation and defense which require application of the actuarial science." Again, the Board is in a special position to provide the court with more than arguments in brief in response to Plaintiffs' evidence which suggest that because the number of catastrophically or

14

It is worth noting that economic losses, unlike awards for pain and suffering, are definable and not subject to the jury's discretion. Insurers, and so too physicians, would still be protected from runaway jury verdicts by a limitation on non-economic damages. According to the affidavit submitted by Dr. Michael Kurth, Louisiana is only *one of six states* that extend the cap to include economic damages. In fact, the American Bar Association's Commission on Medical Professional Liability has recommended that no dollar limit be imposed on recovery of economic loss. While excluding economic damages is one way to equalize the treatment of malpractice victims as suggested by the Plaintiffs, it is by no means the only method.

The third benefit highlighted by the *Butler* majority was that the MMA guarantees payment of all medical care and related benefits. The Plaintiffs suggest allowing them to recover damages in parity with all other malpractice victims will not automatically impact or increase the PCF's statutory obligation to pay future medical and related expenses to malpractice victims. The PCF has paid the maximum amount it is required to pay to these Plaintiffs; and, they are not demanding more from it. Mr. Arrington died as a result of his injuries. Neither he nor any of his family members will receive any "medical or related benefits" from the PCF to offset the cap's $500,000 limitation.[6] Thus, the most important "*quid pro quo*" benefit the *Butler* court articulated in validating the cap is missing in the case of victims who do not survive

---

severely injured victim is small compared to the total number of malpractice victims, adjusting the cap to provide these victims recovery for their economic losses will not substantially affect the surcharge rate paid to the fund or premiums paid to insurers by healthcare providers.

[6] Because Mr. Arrington died there is no obligation for continuing medical benefits. Moreover, the courts have held the costs associated with burying the victim are included in the cap, thereby leaving this financial burden to the family. Galen-Med, whose liability was limited in advance of trial to $10,000, refused to pay Mr. Arrington's embalming fee arguing this cost was not a "medical" expense recoverable over and above the statutory limit. *See Arrington v. E.R. Physicians Group APMC*, 2003-02 (La.App. 3 Cir. 5/21/03); 847 So.2d 236.

their injuries.[7]

Additionally, the Plaintiffs argue a catastrophically injured victim is severely disadvantaged, *even after judgment*, because the PCF Oversight Board requires these victims ofttimes, to continually re-litigate a claim for much needed future medical care. See *Maraist v. Alton Ochsner Medical Foundation*, 02-2677 (La.App. 1 Cir. 5/26/04), 879 So.2d 815; *Manning v. United Medical Corporation of New Orleans*, 04-0310 (La.App. 4 Cir. 3/2/05), 897 So.2d 867. Thus is a result, they contend, that was never intended by the statute. *See Bartee v. Children's Clinic of Southwest Louisiana, et al.*, 05-583 (La.App. 3 Cir. 8/17/05), 910 So.2d 470, *writ denied*, 05-2465 (La. 3/24/06), 925 So.2d 1230; *Kelty v. Brumfield*, 93-1142 (La. 2/25/94), 633 So.2d 1210.

Further, the Plaintiffs argue the PCF has assumed a status as a *de facto* party-litigant, which result was again never intended by the statute. *Graham v. Willis-Knighton Medical Center*, 97-0188 (La. 9/9/97), 699 So.2d 365; *Conner v. Stelly*, 02-0280 (La. 1/30/02), 807 So.2d 827.

As it stands today, the record does not contain any evidence tending to show that fashioning a more equitable and nondiscriminatory remedy for catastrophically and severely injured victims will undermine the public purpose for the Act's adoption recognized by the supreme court in *Butler;* nor does the evidence suggest that a more equitable remedy will cause the State to revisit the perceived health care crisis which served as the impetus for the legislature's enactment of the MMA's limitation.

The supreme court in *Sibley II* clearly holds "when a statute classifies persons on the basis of ...physical condition, *its enforcement shall be refused unless the state* or other advocate of the classification *shows that the classification has a reasonable*

---

[7] Thus, Mr. Arrington is a member of another subclass whose members do not fully share in the benefits mentioned in *Butler*.

*basis*." *Id.* at 1107. In this case, the State opted, perhaps at its peril, to rely on prior jurisprudence despite the current evidence presented by the Plaintiff which, if left unrefuted, substantially lessens the weight of the evidence it apparently relied on in *Butler* to satisfy Art. I, § 3's heightened burden. While I reject the State's excuse for not meeting its burden, I would remand this case, as the supreme court found it necessary to do in *Sibley II*, for a full and fair hearing in the interest of justice on all issues bearing on whether a *reasonable basis* still exists for maintaining the discriminatory classification affecting Plaintiffs' right to full recovery in this case and whether the $500,000 limitation as it affects the right of catastrophically or severely injured malpractice victims *continues to further a legitimate public purpose.* I would direct the trial court to allow the State, the PCF, the Plaintiffs and all interested and affected parties to present additional evidence on the constitutional issues raised herein and render a new decision after conducting a hearing and considering all the evidence.

NO. 04-1235

THIRD CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

SUSAN ARRINGTON

VERSUS

ER PHYSICIANS GROUP, APMC, ET AL

EZELL, J. Concurs.

I concur with Judge Pickett's opinion but would find that the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, *et seq*., is unconstitutional on other grounds as well. Equal Protection is not afforded those who have injuries that exceed the damages cap. The statute creates classes of victims that are not equally compensated for their damages. Those who have damages that fall within the cap are compensated completely. Those who have damages that exceed the cap are not completely compensated, thus creating one of many sub-classes of claimants.

The purpose stated by the legislature for the enactment of this statute was to reduce or hold the line on increases in insurance premiums and rising health care cost in our state. If this was the goal, the legislature has failed to achieve this goal. The best way to deal with the problem of increasing insurance premiums is to correct the acts that cause the negligent acts. We should not shield negligent health care providers from their negligent acts. Capping damages diminishes the deterrent effect of tort law.

In reviewing the record, the statute being attacked as unconstitutional I can find no rational basis for the enactment of this statute other than the protection of a very limited segment of society at the expense of the most grievously injured claimant. The most affected group of claimants are young people. This is due to the fact that they will endure these injuries for a substantial portion of their lives. We recognize the fact that the legislature can regulate our economy, but it is not right to shift the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of injured patients.

There is no recovery set forth in the statute for provable economic damages which are allowed in every tort action other than one filed under this statute. Here again a young claimant is asked to carry the load for the insurance and negligent health care provider, in that, they will not receive what they are due if they have provable economic damages that exceed the cap. This case is an example of this injustice.

There is a false assertion that the tort system is "broken" or in need of repair. If we assume that this assertion is right, the cap imposed to fix the system is at the expense of those most seriously injured. This is neither fair nor equitable.

I can find no rational relationship existing between the classification of victims in the $500,000 cap on non-economic damages and the legislative objective of compensating victims of medical malpractice fairly. Another objective of the legislature, as we previously stated, was to lower malpractice insurance premiums. The facts as presented in this case, clearly show that the cap adopted by the legislature is arbitrary and unreasonable in that it has no relationship to the lowering of medial malpractice insurance premiums. If there was a crisis when the legislation was passed, which has not been shown by the State, that alone would not render the law valid forever.

I agree with those courts that have found that there is little, if any, correlation between caps on non-economic damages and the redirecting of medical malpractice premiums or overall health care costs. The evidence of studies done in reference to the malpractice caps, which are part of this record, indicate that caps on non-economical damages do not affect doctors' migration. The non-partisan United States General Accounting Office concluded that doctors do not appear to leave or enter states to practice medicine based on caps on non-economic damages in medical malpractice actions.

Studies reviewing the facts of practicing defensive medicine simply show that it is very hard to measure that cost and even harder to measure when trying to determine the effect it would have on insurance premiums. I recognize that it is well-settled law that courts should presuppose that the legislative judgment is sound and try to support the legislative act. This act is so flawed with speculation and void of any quid pro quo that I have difficulty finding a connection between the means and ends.

I cannot find any objective basis for the enactment of this legislation.