# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-439

**JOE OLIVER, ET AL.**

**VERSUS**

**MAGNOLIA CLINIC, ET AL.**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2005-3907
HONORABLE CLAYTON DAVIS, PRESIDING
**********

## SYLVIA R. COOKS
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, J. David Painter, and Shannon J. Gremillion, Judges.

**AFFIRMED IN PART; REVERSED IN PART; EXCEPTION OF RES JUDICATA DENIED.**

**Saunders, J., concurs in the result with written reasons.**

**Painter, J., concurs in the result for the reasons assigned by Saunders, J.**

**Gremillion, J., dissents and assigns written reasons.**

Todd A. Townsley
Marcus P. LaCombe
The Townsley Law Firm
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 478-1400
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Joe and Helena Oliver

**Richard B. Cappe1**
**Raggio, Cappel, et al.**
**P.O. Box 820**
**Lake Charles, LA 70602**
**(337) 436-9481**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Magnolia Clinic and Susan Duhon**

**John Elliott Baker**
**321 N. Vermont Street #208**
**Covington, LA 70433**
**(985) 867-9068**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **State of Louisiana**

**Nadia Marie de la Houissaye**
**Longman Russo**
**P.O. Drawer 3408**
**Lafayette, LA 70502-3408**
**(337) 262-9000**
**COUNSEL FOR INTERVENOR/APPELLANT:**
    **Louisiana Patients Compensation Fund**

**Guice Anthony Giambrone, III**
**Kelly A. Dugas**
**3421 N. Causeway, 9th Floor**
**Metairie, LA 70002**
**(504) 891-4091**
**AMICUS CURIAE:**
    **Louisiana Association of Nurse Practitioners**

**COOKS, Judge.**

Joe and Helena Oliver (Plaintiffs), individually and on behalf of their minor child, Taylor Oliver, appeal the trial court's judgment applying the Louisiana Medical Malpractice Act's cap, reducing a six million, two hundred and thirty-three thousand dollar ($6,233,000) jury general damage award in their favor to five hundred thousand dollars ($500,000) and denying their petition seeking to have the Medical Malpractice Act's (MMA) limitation, La.R.S. 40:1299.42(B), as applied to their claims, declared unconstitutional. The Louisiana Patients' Compensation Fund (PCF) also appeals the judgment and alleges the court committed error in awarding the Olivers past medical expenses and judicial interest on these expenses. Susan Duhon, the nurse practitioner whom the Medical Review Panel and jury found committed malpractice, filed a peremptory exception of *res judicata* challenging the Olivers' right to appeal the trial court's judgment reducing the jury's general damage award because, as she alleges, the Olivers only appealed the denial of the declaratory judgment and not the judgment on the underlying tort claim.

We reject the position of the PCF and Nurse Duhon for reasons that follow. We also find, as the Supreme Court similarly held in *Sibley v. Board of Sup'vrs of Louisiana State Univ.*, 477 So.2d 1094 (La.1985) (commonly referred to as *Sibley II*), that the MMA's cap on general damage awards unconstitutionally disadvantages and discriminates against Taylor and her parents, victims of nurse Duhon's malpractice, because of the severity of Taylor's physical condition when compared to other malpractice victims who receive full recovery for their injuries. We further find the State failed to present sufficient evidence to show that any reasonable basis exists today to continue such discrimination by expanding the MMA's limitation on general tort liability to include Nurse Practitioners, some of whom are

-1-

"grandfathered" from having to complete the academic studies and degree requirements found in La.R.S. 37:913(3)(a) and who choose to own and operate private healthcare clinics in the State of Louisiana. We must declare the Act's cap, when used to limit this group of healthcare providers' general liability for damages caused to severely or catastrophically injured victims, not only discriminatory as declared in *Sibley II*; but that its application, in these instances, violates the Equal Protection Clause of Article I, Section 3 of the Louisiana Constitution. *See Sibley II*, 477 So.2d at 1103. We, therefore, are constitutionally mandated in this case to refuse enforcement of the cap to insulate these practitioners from full liability for the harm they cause without a reasonable basis having been advanced by the State or other advocates as explained hereinafter.[1]

## FACTS AND PROCEDURAL HISTORY

Susan Duhon, a registered nurse practitioner, opened The Magnolia Clinic to provide primary care to pediatric patients in Southwest Louisiana. In 1974, Ms. Duhon obtained a diploma in nursing from a hospital which later certified her as a pediatric nurse practitioner in 1977. Currently, to qualify as a nurse practitioner, a nurse is required to obtain a baccalaureate of science and a masters of science in nursing. La. R.S. 37:913(3)(a). Although Ms. Duhon did not obtain any degree in nursing from an institution of higher learning, she was allowed to escape the more rigorous requirements enacted by statute with only a high school degree, under the "grandfathered" exception.

Ms. Duhon became a qualified health care provider for purposes of the MMA by purchasing the requisite malpractice insurance coverage from St. Paul Fire and

---

[1] We note, while a majority agrees that the cap's limitation should not be imposed in this case, and the judgment must be reversed in part, two members assign constitutional reasons and two members assign statutory reasons for rejecting the application of the cap. The matter was submitted to the Court following a request for en banc consideration of the case. The request was denied. We now elect to release the case "as is" and to await instruction from the Louisiana Supreme Court.

Marine Insurance Company.[2]  Nurse Practitioners are required by La.R.S. 37:913 to collaborate with a physician.  Dr. Jennette Bergstedt, M.D. was the physician Ms. Duhon selected and agreed to collaborate with when providing primary care from the Magnolia Clinic which she operated as sole owner.

Taylor Oliver was born on September 5, 2000.  Shortly after birth, Taylor began experiencing health problems.  Her mother brought her to the Magnolia Clinic, where she was treated exclusively by Ms. Duhon.  The record indicates Taylor presented several times per month with various complaints, including: Repeat infections, persistent abdominal pain, nausea, vomiting, diarrhea, and anemia. Taylor's mother reported to Ms. Duhon that the child occasionally awakened at night screaming from abdominal pain.  During Taylor's first year of life, she was treated at the Magnolia Clinic on thirty-two (32) occasions.

Despite her statutory duty to consult with a physician when needed, Ms. Duhon did not collaborate with Dr. Bergstedt concerning Taylor's condition.  Instead, she repeatedly offered only verbal reassurances to Taylor's mother and prescribed over thirty (30) medications, including antibiotics, to treat the child's multiple complaints and observable symptoms.  Taylor's mother testified when she asked to see Dr. Bergstedt, she was told by Ms. Duhon the only time Taylor needed to see Dr. Bergstedt was in connection with admission to a hospital.

On November 7, 2001, after no progress was made in Taylor's health, her mother brought her to Women & Children's Hospital in Lake Charles, where Taylor was treated for the first time by Dr. Bergstedt.  Multiple tests were ordered by the doctor, and she referred Taylor to Texas Children's Hospital for specialized care.

_____

[2]The MMA limits the damages that may be awarded against health care providers who become "qualified" by presenting proof of the purchase of malpractice insurance or who deposit $125,000 in cash or other security with the PCF.  La.R.S. 40:1299.42.

Eventually, Taylor's condition was diagnosed as neuroblastoma, a form of childhood cancer originating in the nerve tissue. The scant medical records maintained by the Magnolia Clinic revealed at approximately six (6) months of age, Taylor developed severe bruising around the eyes–one of the telltale signs of childhood neuroblastoma. If neuroblastoma is diagnosed within the first year of life, a child has a ninety (90) percent chance of an *event free survival*. However, Taylor's opportunity to live a normal life was lost when her condition was not timely identified.

Taylor has survived the cancer, but the quality of her life has been severely diminished. The tumor advanced into her long bone, face, eyes, ears, skull and spine. Her head is abnormally large and misshapen. Her eyes are abnormally large, bulbous, and opaque with cataracts, rendering her legally blind. Her bones have become weakened and brittle, such that she cannot participate in common youth activities, and she struggles each day to overcome learning disabilities.

The Olivers pursued medical malpractice claims against Ms. Duhon and Dr. Bergstedt. Ultimately, Dr. Bergstedt was dismissed from the suit. The matter was tried before a jury, which returned a verdict against Ms. Duhon in favor of the Olivers, on Taylor's behalf, for $6,000,000.00 in general damages, $629,728.24 in past medical expenses, and $3,358,828.00 in future medical expenses. The jury awarded Mr. Oliver $33,000.00 for loss of consortium and Ms. Oliver $200,000.00.

Attempting to avoid the harsh consequence of the MMA, which limits Taylor and her parents recoverable general damages to $500,000.00 (one-twelfth of the jury's award), plaintiffs filed a Petition for Declaratory Relief asserting the MMA is unconstitutional on several grounds. In their petition, they specifically alleged the MMA: (1) Establishes an inadequate remedy in violation of Taylor's right under Art.

I, §22; (2) precludes any remedy for Mr. and Ms. Oliver, again in violation of Art. I, §22; (3) violates the separation of powers provision of Art. V, §16 in that it constitutes a prejudgment of the compensation award in medical malpractice cases, which is the province of a district court; (4) creates an immunity in favor of health care providers in violation of Art. III, §12(7); and (5) denies equal protection to severely injured patients in violation of Art. 1, §3. They prayed that the court declare the cap unconstitutional.

The State of Louisiana and the Louisiana Patients Compensation Fund (PCF) intervened in the suit to challenge Plaintiffs' attack on the constitutionality of the MMA. The trial court rendered written reasons for judgment after conducting a full *Sibley II* hearing. Initially, the trial court declared the cap constitutional in all respects except its inclusion of nurse practitioners as qualified providers. The trial court found there was no evidence demonstrating that there "was a crisis in the field of nurse practitioners either at the time of the passage of the Act or today." Further, he observed the State offered no evidence to show a need for including nurse practitioners in the class of healthcare providers protected by the MMA. He concluded, while the cap was arguably necessary in 1975 (when the MMA was adopted) for doctors and hospitals, extension of the Act to include nurse practitioners does not logically follow without evidence to show "a reasonable basis" exists for limiting their liability.

Ms. Duhon and the State filed a Motion for New Trial/Reconsideration on the Issue of Constitutionality, alleging the trial court erred in declaring "the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, unconstitutional even though the Plaintiffs had only pled the unconstitutionality of La.R.S. 40:1299.42(B)." They maintained there simply was no allegation that La.R.S. 40:1299.41(A)(1) (the listing

of who are qualified healthcare workers) is overly inclusive. Thus, Ms. Duhon and the State argued, since Plaintiffs never pled the unconstitutionality of La.R.S. 40:1299.41(A)(1), any constitutional challenge based on that ground was not properly before the trial court. The trial court agreed, setting forth the following reasons:

> The State's main argument regarding this motion is that Plaintiffs did not properly raise the constitutional issue in the pleadings. A constitutional challenge must be specifically pled. The Plaintiffs never raised the issue of whether the Louisiana Medical Malpractice Act is overly broad due to its inclusion of nurse practitioners cap. As a result, the Plaintiffs' argument fails on its face due to procedural insufficiency.
> The Court agrees with the State that the issue was not pled specifically. As a result the Court GRANTS the Motion for New Trial/Reconsideration on the Issue of Constitutionality and reverses its decision on the issue of constitutionality ruling the Medical Malpractice Act constitutional.

The trial judge then signed a judgment reducing the jury's award to conform with the limitation on general damage recovery and other restrictions of the Louisiana Medical Malpractice Act. The Olivers appealed this judgment, arguing the trial court erred in finding the Medical Malpractice Act's limitation on recovery (the cap), La.R.S. 40:1299.42(B), is constitutional as applied to Ms. Duhon and Taylor in this case. Ms. Duhon has raised a peremptory exception of *res judicata*, asserting the Olivers only appealed the declaratory judgment and not the judgment on the verdict in the underlying tort claim. The PCF also assigns as error the trial court's award of past medical expenses and the award of interest thereon.[3]

## ANALYSIS

### I. Peremptory Exception of Res Judicata.

Ms. Duhon filed a peremptory exception of *res judicata* alleging that the Olivers did not appeal the judgment entered in the tort claim, but rather only the judgment in their declaratory judgment action. Thus, she argues, the judgment on the

---

[3] We further note, Ms. Duhon has not requested that we address the general damage amounts awarded by the jury.

jury's verdict is final. We disagree.

The judgment limiting Ms. Duhon's liability to $100,000 was rendered on December 30, 2008. The relevant portion of the trial court's judgment read as follows:

> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the challenge of the limitation on recovery imposed by the Louisiana Medical Malpractice Act La. R.S. 40:1299.42(B) is constitutional.**
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the amount of damages set forth in the original verdict of June 8, 2007 will be adjusted and reduced to the limitations imposed by the Medical Malpractice Act.**

The trial court then reduced Ms. Duhon's liability as the healthcare provider from $6,000,000 to $100,000 pursuant to La.R.S. 40:1299.42(B). In their timely appeal, the Olivers listed four separate errors committed by the trial court, all of which clearly maintain that the MMA's limitation on their recovery is unconstitutional. Defendant Duhon contends in her exception that the Olivers appealed "only" the judgment associated with the Declaratory Judgment action. The Olivers note there are no other final judgments in this matter, other than the judgment reducing Ms. Duhon's liability from $6,000,000 to $100,000 based on La.R.S. 40:1299.42(B). We also note the Uniform Rules- Courts of Appeal 2-12.4 requires that an appellant attach a copy of the complained of judgment. The Olivers attached a copy of the December 30, 2008 judgment reducing their recovery to the amount of the cap. An appeal from this judgment, therefore, was timely perfected by the Olivers. We find no merit in Ms. Duhon's peremptory exception of *res judicata*, and it is denied.

## II. The PCF's Assignments of Error.

The PCF assigns two errors in the underlying tort judgment: The award of Taylor's past medical expenses and interest on these expenses.

*A. Medical Expenses.*

The jury awarded Taylor past medical expenses of $629,728.24. The trial court assessed these expenses against the PCF. The PCF complains that the judgment twice references past medical expenses. The first is the specific recognition of the award in the judgment. The second, the PCF argues, is contained in the succeeding paragraph, in which the judgment provides, "[Taylor] is a patient in need of future medical care and related benefits . . . . and is thus entitled to receive compensation from The Louisiana Patients Compensation Fund and Oversight Board for all past, present, and future medical and related services."

The obligation of the PCF to pay "future medical care and related expenses" is governed by La.R.S. 40:1299.43, which reads, in pertinent part:

> B. (1) Future medical care and related benefits for the purpose of this Section means all of the following:
>
> (a) All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award.
>
> (b) All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provisions of such services, after the date of the injury that will be incurred after the date of the settlement, judgment, or arbitration award.
>
> (2) Future medical care and benefits as used in this Section shall not be construed to mean non-essential specialty items or devices of convenience.

The plain wording of the statute is clear. Future medical care and related expenses include all related reasonable medical expenses incurred from the date of injury up to the date of judgment, and all such expenses that will be incurred after the date of judgment. Accordingly, this assignment of error is without merit.

*B. Judicial Interest.*

-8-

The PCF also assigns as error the award of judicial interest on the past medical expenses. It cites no legal authority for its proposition, other than the fact that a lien for medical expenses in favor of the Department of Health and Hospitals exists. We note, neither the Code of Civil Procedure article 1921, nor our jurisprudence, allow any discretion in the assessment of judicial interest. *See Odom v. City of Lake Charles*, 00-1050 (La.App. 3 Cir. 1/31/01), 790 So.2d 51, *writ denied*, 01-1198 (La. 6/22/01), 794 So.2d 787. We affirm the award of judicial interest.

### III. The Olivers' Assignments of Error.

The Olivers assert the cap violates a number of provisions of the Louisiana Constitution of 1974: (1) the "due process" and "adequate remedy" provisions of La.Const. art. I, § 22; (2) the "separation of powers" provision of La.Const. art. 2, § 2; (3) the provisions of La.Const. art. III, §§ 2 and 12, in that it is a "special law" granting privileges and immunities and changes the method of collecting debts and enforcing judgments; (4) the provisions of La.Const. art. V, § 16, in that no amendment to the constitution was ever adopted changing the original jurisdiction of the district courts; and (5) the equal protection guarantee of La.Const. art. I, § 3. Because we find the Olivers' "equal protection" argument has merit, we elect not to address the other constitutional challenges raised by them.

### A. Equal Protection Challenge.

As can be seen in *Arrington v. ER Physicians Group, APMC*, 04-1235 (La.App. 3 Cir. 9/27/06), 940 So. 2d. 777, Plaintiffs in this case are not the first to attack the constitutionality of the Medical Malpractice Act as applied to severely or catastrophically injured victims based on the Equal Protection guarantee found in Article 1, §3 of the Louisiana Constitution which provides:

> No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs,

or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.

Although Plaintiffs in this case, like other litigants before them, assert that applying the $500,000 MMA cap to reduce the jury's general damage award will result in them receiving an inadequate remedy for the severe harm occasioned by Ms. Duhon's negligence, this legislated consequence alone does not necessarily constitute a violation of Louisiana's constitutional guarantees. The Supreme Court made clear in *Everett v. Goldman*, 359 So. 2d 1256 (La.1978), unless a fundamental right is impacted or a separate or suspect classification is created, the legislature is constitutionally free to limit damage recoveries or to grant immunities from suit so long as it articulates a rational basis for the discriminatory treatment reasonably related to the governmental interest sought to be advanced. *Id.* at 1266. The Supreme Court has also held that "[t]he right of malpractice victims to sue for damages caused them by medical professionals does not involve a fundamental constitutional right. Thus, it is to be tested by the lesser standard of rational basis." *Id*. at 1268-1269. The rational basis offered by the State for applying the cap in this case is the same echoed by it in all the prior cases addressing the limitation on recovery issue. The State maintains the legislative purpose underlying enactment of the MMA's $500,000 cap in Louisiana was to assure available and affordable malpractice insurance for healthcare providers, and to prevent flight of these professionals from this State. This purpose, the State insists, is still the cap's goal; and, it points out, Louisiana courts, since the cap's enactment, have found it rational and reasonably related to advance the government's interest in assuring accessible healthcare and lower healthcare costs generally for citizens of this State. *Sibley v. Board of Sup'rs of Louisiana*, 462 So.2d 149 (La. 1985), (commonly referred to as *Sibley I)*; *Everett*, 359 So. 2d 1256; *Armand*

*v. State*, 00-1457 (La. App. 1 Cir. 6/21/02), 822 So. 2d 671, *writ denied*, 02-2036 (La. 11/1/02), 828 so. 2d 583; *Ruiz v. Oniate*, 00-2105 (La. App. 4 Cir. 12/27/01), 806 So. 2d 81; *LaMark v. NME Hospitals, Inc*. 542 so. 2d 753 (La. App. 4 Circ. 1989), *writ denied*, 551 So. 2d 1334 (La. 1989).

But the "rational basis" offered by the State to ward off constitutional challenges to the cap's application in most cases has not been accepted without more in cases involving severely or catastrophically injured victims. This is because the equal protection right all citizens in Louisiana share, guaranteed in Art. 1, §3 of this state's constitution, limits the legislature's authority to infringe upon not only fundamental rights; but, it also limits the legislature's power to enact laws that "arbitrarily, capriciously, or unreasonably discriminate" against it citizens by creating separate or suspect classifications "because of birth, age, sex, culture, *physical condition*, or political ideas or affiliation." When the State *chooses* to provide an "adequate remedy" to some members of a class of victims and denies an "adequate remedy" to other members of the same class because of their *physical condition*, it creates a separate or suspect classification. Legislation that allows some medical malpractice victims to receive full recovery for the injuries they sustained, but limits the recovery of other victims whose injuries exceed $500,000 clearly creates two classes of victims. In *Sibley II*, the Louisiana Supreme Court held the MMA's limitation in operation "classifies individuals because of their physical condition." It explained:

> The law on its face is designed to impose different burdens on different classes of persons according to the magnitude of damage to their physical condition. The statute creates two classes: One, a group of malpractice victims each of whom have suffered damage that would oblige a defendant under our basic law to repair it by paying in excess of $500,000 dollars; another, a class consisting of victims whose damage would not require an award over this amount to make individual reparation. Victims in the former class are prevented from recovering

-11-

the allowed full recovery. Damage to the physical condition of each malpractice victim is the primary element of his being assigned to one of the two classes. Thus, the statutory classification disadvantages or discriminates against one class of individuals by reason of or because of their physical condition.

*Id*. at 1108-1109.

This Court further noted in *Arrington*:

Moreover, not only does the MMA's cap discriminate between victims in the same class, it also creates subclasses of catastrophically or severely injured victims of malpractice by limiting recovery to one award of $500,000. The subclasses are created depending on whether the catastrophically or severely injured patient has a spouse, minor children or parent. For example, as recognized in *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, 446 (2005), a single patient may recover in Louisiana the entire $500,000 while a married catastrophically injured victim must share the cap with his or her spouse and children.

*Arrington*, 940 So.2d at 791-792.

Thus, the Louisiana Supreme Court held in *Sibley II* that the State must articulate more than a "rational basis" for the cap in cases involving severely or catastrophically injured victims of malpractice to avoid Article 1, §3's constitutional bar to its enforcement. It must also "show that the law does not arbitrarily, capriciously, or unreasonably discriminate against [this] disadvantaged class by demonstrating that the *legislative classification substantially furthers a legitimate state objective.*" *Sibley II*, 477 So.2d at 1104.

Taylor is a severely injured victim of malpractice. Her injuries occurred when she was only a baby and will last a lifetime with devastating and debilitating effects upon her capacity to perform even the most basic human functions. The State offered no evidence in this case, as in the cases prior, to refute the fact that the cap discriminates against Taylor and her parents by limiting their general damage recovery to a single $500,000 payment, while allowing other less severely injured victims to fully recover their general damage awards. But, the State maintains that

-12-

applying the cap to reduce Taylor's and her parents' general damage awards not only serves the State's purpose in lowering malpractice insurance costs for healthcare providers; but, it thereby furthers the State's legitimate objective in assuring accessible and affordable healthcare for its citizens generally. The State also argues, just as it did in *Butler v. Flint Goodrich Hosp.*, 607 So. 2d 517 (La. 1992), that the Act's $500,000 limitation provides three benefits to the severely injured medical malpractice victim which serves as a *quid pro quo*–a reasonable alternative remedy–to offset the Act's discriminatory impact on the general damage claims of these victims and their families. The State recites in brief that it presented expert testimony by Mr. Bickerstaff, a consulting actuary, showing–just as the Supreme Court found in *Butler*–the cap benefits this group in three ways: (1) A greater likelihood exists that the offending physician or other healthcare provider will have malpractice insurance; (2) it fulfills the State's legitimate objective of assuring that this group's future medicals will be satisfied; and (3) it assures their claims will be paid from a solvent Patient Compensation Fund. In sum, the State argues, "the very *quid pro quo* that was determinative of the constitutionality of the cap in 1992 [when the Supreme Court decided the equal protection claim raised by this group in *Butler*] continues to exist today." We therefore are obliged, the State urges, to follow the *Butler* holding. We do not believe that holding precludes us from revisiting the equal protection issue plaintiffs' advance based on present day realities and the evidence actually presented in this case.

The Supreme Court's holding, nearly eighteen years ago in *Butler*, was based on evidence presented in that case at a time long past. We noted in *Arrington*, the Wisconsin Supreme Court in *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W. 2d 440, 448 (2005) (emphasis added)

-13-

recognized:

> [A] statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crises does not forever render a law valid. Over a period of time social, political, and economic changes may render a statute obsolete. . . . Where changed conditions have rendered a statue unconstitutional, the basis for its abrogation by court action is clear. *It is well settled that the continued existence of facts upon which the constitutionality of legislation depends remains at all times open to judicial inquiry.*

Prior to and since *Ferdon*, many courts in states across this country–including Alabama, New Hampshire, Texas, Georgia, Illinois, North Dakota, and Florida–have not felt so constrained to follow precedence and have refused enforcement of medical malpractice caps based on state constitutional guarantees.

We note further, most states' Medical Malpractice Acts distinguish between economic and non-economic damages; and these states' caps limit *only* non-economic damages. Generally, non-economic damages include pain and suffering, physical impairment, inconvenience, anguish and disfigurement. These damages are more difficult to determine and have often been criticized because juries are left to assign values without much constraints, which in some states have resulted in "run-away awards" and million dollar judgments for minor injuries. Economic damages include lost wages, past medical expenses and future medical expenses. These damages are easier to determine and are subject to mathematical calculation. Louisiana's Medical Malpractice Act does not differentiate between economic and non-economic damages. The $500,000 cap, when originally enacted in 1975, applied to the "total amount recoverable," including economic and non-economic damages. The cap was amended in1984 to exclude the cost of "future medical care and related benefits" and these costs are no longer limited but are subject to administrative approval and reviews. There are only four other states with all inclusive caps like Louisiana: New

Mexico, Indiana, Nebraska, and Virginia. Indiana, whose medical malpractice act was used as a model by the drafters of Louisiana's MMA, currently provides $1,250,000 in recoverable general damages. *See* Ind. Code Ann. 34-18-14-3(a)(3). Louisiana's all inclusive cap remains the lowest in the nation. *See* Allison B. Lewis, *Unreasonable and Imperfect: Constitutionality of the Louisiana Medical Malpractice Act's Limit on Recovery*, 69 La. L.Rev. 417, 439.

Plaintiffs contend, during the *Sibley II* hearing in this case, "the State did not meet its burden of proof in showing the MMA cap on damages [does] not arbitrarily, capriciously or unreasonably discriminate nor did the State demonstrate that the legislative classification substantially [furthers] a legitimate state objective." Plaintiffs point out there are several empirical studies showing the cap in Louisiana and caps generally across this country have not had their intended effect; and, Louisiana's cap is not furthering a legitimate state objective sufficient to infringe upon Taylor's and her parents' constitutional right to recovery in parity with those malpractice victims who suffer less harm. Plaintiffs also urge the *"quid pro quo"* or alternative remedy theory used by the *Butler* court to balance the unequal general damage recoveries for these victims against those less injured is no longer viable for several reasons.

The State relies on the expert testimony it adduced from two witnesses during the *Sibley II* hearing and argues the evidence establishes the cap still serves a legitimate state interest and "the very *quid pro quo* that was determinative of the constitutionality of the cap in 1992 continues to exist today." Mr. Bickerstaff testified that the capital structure of an insurance company includes its assets and liabilities. Under the liability column are "reserves (consisting of unpaid losses and loss expense amounts); unearned premiums; and miscellaneous expenses." He

pointed out the reserves "take up by far the greatest portion" of the insurer's liabilities but these losses are not certain and "can range all over the place." The State notes he testified "that the biggest factor in how wide the range of estimates will be is the policy limit, i.e., the maximum liability of the insurance company under the policy, with a lower policy limit resulting in less variability and therefore less uncertainty in the estimate of the unpaid losses." Thus, in his expert opinion, caps enable insurance companies to more accurately estimate reserves, more precisely charge premiums, and remain solvent to pay losses. In addition to reserves, insurance companies keep "surplus funds" in the event reserves are insufficient to cover its liabilities due to underestimation of losses. Mr. Bickerstaff "explained in the mid to late 1990's the National Association of Insurance Commissioners adopted standardized formulas, called risk-based capital, for determining the minimum surplus a particular insurance company should maintain based on its level of exposure writing various lines of insurance." He also testified because medical malpractice insurance is one of the riskiest lines of insurance, the formula requires significantly more surplus than other insurers offering different lines of coverage are required to withhold. Again, in this expert's opinion, caps enable insurance companies to keep less surplus, to lower premiums, or to *increase the insurance company's dividends*.

Mr. Bickerstaff also created a model which predicts how much typical medical malpractice insurance premiums would rise if the cap was raised to two million dollars or abolished entirely. The State recites that Mr. Bickerstaff's model was based on information provided by the Louisiana Patient Compensation Fund and LAMMICO Insurance Company. The State acknowledges that the LAMMICO data relied upon by Mr. Bickerstaff is not in the record of this proceeding; and, we have been unable to locate any data in the record from the Louisiana Patient Compensation

-16-

Fund supporting Mr. Bickerstaff's estimations or otherwise used by him in creating the model. In constructing the model, Mr. Bickerstaff assumed that the Louisiana Patient's Compensation Fund would cover all future medical expenses and damage awards between $100,000 and $500,000 as provided by the current cap. If the cap were raised to two million dollars, Mr. Bickerstaff estimated for the excess coverage the average healthcare provider's premium would increase from $10,272.00 to $28,369.00. If the cap was raised to thirty million dollars the average provider's premium would escalate to $40,761.00. The premium increases were predictably higher for neurosurgeons and OBGYN–the higher risk specialties.

Mr. Bickerstaff's model also estimates that 182 claims would exceed the cap leaving the healthcare providers liable for the excess. We are unable to determine from the record or the model created by Mr. Bickerstaff how he arrived at this number, what period it covers–years or decades--and no attempt was made by him to estimate the number of claims which might be filed by severely or catastrophically injured victims during the same period. The PCF, though an intervenor and present at the *Sibley* hearing, did not introduce any data or other information documenting the number of severely injured victims filing claims since enactment of the MMA and the medical costs associated with the care of these patients, which has been paid by the Fund since the adoption of the Act or any other definable period of time. The record is devoid of any evidence showing the number of victims who died shortly after their injuries versus those who survived for years.

The State also elicited testimony from Dr. Bauer, an expert Medical Economist. The State asserts that Dr. Bauer's testimony exposes the "fallacy" of Plaintiff's argument which asserts that any increase in medical malpractice insurance premiums can easily be passed on by doctors to the consumer. It claims Dr. Bauer's testimony

could not be clearer that doctors do not have the option to pass on these increased costs. The real "fallacy" of reasoning, however, is demonstrated in examining Dr. Bauer's expert testimony, and the basis, or rather lack thereof, for his conclusions.

Dr. Bauer bases his expert opinion on a comparison of the increase in medical costs from 1975 to 2006 and the increase in "non-medical" costs. From what we are able to surmise from the record, non-medical costs is a very broad category and Dr. Bauer does not aid us in evaluating the strength of his testimony by disclosing what "non-medical" costs he is using as a comparison i.e, whether it includes increases in the price of airline tickets, vegetables at the local superette, or tea from China. Experience teaches us that statistics are notoriously prone to manipulation when based on ill-defined categories. Dr. Bauer eventually concludes that a medical malpractice plaintiff was better off economically when recovering damages under the cap in 2006 than in 1975 because, he says, he determined the cost of medical care increased 1.97 times faster than "non-medical" costs. This number, however, is meaningless to us without knowing what "non-medical" costs Dr. Bauer used as a comparison. Even if we were to assume this number is correct, it does not lead us to the conclusion suggested by the State. As the State points out, Dr. Bauer also claims, using his comparison to "non-medical" costs, the differential between 1992 and 2006 was only 1.25, with medical costs increasing at the faster rate. But faster than what?

Dr. Bauer relies on national averages for physicians and surgeons incomes based on peer-reviewed articles. No mention is made of the figures for physicians and surgeons in Louisiana; yet, based on national average information, Dr. Bauer posits that Louisiana doctors simply could not afford an estimated $34,000.00 increase in premiums if the cap was entirely eliminated and asserts that they just cannot pass this cost on to consumers. Dr. Bauer testified physicians incomes,

presumably nationally, have not increased, but one cannot help but wonder what part did physicians' incomes play in the 1.97 and 1.25 increase in medical costs over the years since 1976. Averaged information based on national data is not very helpful in determining the questions before us and assessing the impact, if any, an increase in the cap might have on Louisiana's healthcare system. Dr. Bauer's conclusions are premised on disconnected leaps in reasoning based on ill-defined data and generalized information. His conclusions are unpersuasive and of little use in determining whether a plaintiff in Louisiana, compensated under the medical malpractice cap, is indeed better off in 2006 than in 1975. Likewise, his conclusions are also unpersuasive and of no use in determining whether doctors could in fact pass along an increase in the cost of medical malpractice insurance premiums, particularly considering they have through the years passed on other increases in overhead perhaps some of which account for the 1.97 and/or 1.25 increase in medical costs when compared to whatever "non-medical" costs Dr. Bauer employed in his analysis.

None of the State's experts took the time to project the premium increase an average healthcare provider would pay if the current cap was maintained, but severely or catastrophically injured victims and their qualifying family members also were allowed to recover economic losses up to a fixed amount–for example, up to one million dollars. In *Arrington* we attempted to encourage the PCF, because of its unique position and statutory duty to "collect, accumulate, and maintain claims experience data from enrolled healthcare providers and insurance companies," to provide us with sufficient documentation in the future to aid us in intelligently reviewing the record and determining whether the current cap, as applied to limit the general damage claims of severely or catastrophically injured victims, continues to serve a legitimate state interest without trampling on these victims' constitutional

right to parity recovery and protection from discrimination.

Nevertheless, there are available published studies which cause us to question the conclusions made by the State's experts. For years the U.S. General Accounting Office, a non-partisan federal government arm of Congress, has gathered data from sources across this country to evaluate and investigate the underlying factors which contribute to increases in malpractice insurance premiums. One study prepared by it in 2003 concludes that a number of factors affect whether medical malpractice premiums increase or decrease, and there is no definitive correlation between caps on non-economic damages and lower medical malpractice premiums. U.S. General Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates*, GAO-03-702 (June 2003). See also, Health Insurance Association of America, *Issue Brief: Why Do Health Insurance Premiums Rise* (Sept. 2002) (indicating that rising consumer health insurance premiums are due to increases in the overall cost of health care and that "claims and consumer services" account for only 0.12 cents of every dollar spent on healthcare.) In one report, the General Accounting Office found differences in premiums and claims payments are affected by other factors–not just caps–such as state premium rate regulations, competition among insurers, interest rates and *income returns on investments by insurers*. In the end, the General Accounting Office could not determine whether differences among states in premium charged by insurers were attributable to the presence or absence of damage caps or to other factors. U.S. General Accounting Office, 03-836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 30 (Aug. 29, 2003). For example, the Office notes Minnesota, which has no caps on damages, has comparatively low growth in premium rates and claims payments. *Id*. at 37. Further, this Court noted in *Arrington*, "[t]he U.S. Department

of Health and Human Services found most victims of malpractice do not file a claim. In fact, only 1.53% of those who are injured even file a claim." *Arrington*, 940 So.2d at 793. Like in *Arrington,* there is nothing in this record to suggest that Louisiana malpractice victims are more litigious than the national average or that Louisiana had a prior history of "run-away" jury awards in malpractice cases.

Plaintiffs also presented expert testimony contradicting the findings and conclusions of the State's experts. Dr. Michael Kurth (an economist) testified, based on studies conducted by the U.S. General Accounting Office, that medical malpractice premiums account for only 1% of healthcare cost in the United States. He noted the Congressional Budget Office also found that non-economic caps do not appear to impact a doctor's decision to practice medicine in a particular state. He further points out there are no studies or economic data to show: (1) That the cap has improved healthcare in this State; (2) that it has resulted in an increased number of healthcare providers in this State; or (3) that it has improved the quality or cost of healthcare in this State *vis a vis* other states. He was not aware of any data, economic rationale, or crisis eliminated by the continued expansion of the MMA to limit the liability of a host of other healthcare providers since its enactment, including more recently, nurse practitioners. The State straightforwardly admits in brief that the legislature, in limiting the liability of nurse practitioners, did not have available any data suggesting a crisis in healthcare would occur if the cap was not so extended. The State simply excuses this failure by saying "unless and until there is a claim against [a] nurse practitioner in excess of the cap," this data is unavailable–but "at that point in time will demonstrate the existence of a crisis for nurse practitioners." The State also presented no evidence to show there is a shortage of physicians in this state and a correlating need for nurse practitioners to operate and own "walk-in" clinics to

make health care more affordable or available to Louisiana citizens. Mr. Bickerstaff indicated there was statistical data available for nurse practitioners, but he chose, or was not asked, to provide it at the hearing. The following exchange occurred between Mr. Bickerstaff and plaintiffs' counsel:

> Q. My point is, if you wanted to concern yourself you could have and you're capable as an actuary of getting data to each specialty, whether it's a podiatrist, a chiropractor, or a nurse practitioner, but the data is out there in actuarial science to figure out as it applies to those, correct?
>
> A. Let me answer it this way.
>
> Q. Could you answer it first whether the data is there and then you could explain it.
>
> A. *The data by specialty is available.*
>
> Q. Okay.
>
> A. It's available on a statewide basis, it's available on a countrywide basis, it's data that we refer to routinely when we're looking at individual state's rate filings.
>
> . . .
>
> Q. Do you have any proof that in 1975 that there was going to be a flight of nurse practitioners, if they weren't covered under this act?
>
> A. Again, I don't have any specific knowledge of nurse practitioners' plight at the time anymore than I do most any other specialty.
>
> Q. Do you have any proof on the other side, that this act has improved and allowed there to be more nurse practitioners, or the state is attracting nurse practitioners here who would have gone to other states? Do you have any data for that?
>
> A. I don't myself. *I think there is data available for that, though.*

A review of jurisprudence across the country shows, when courts have considered similar malpractice caps in response to state constitutional challenges by severely or catastrophically injured victims, they have been troubled by the disparate impact caps have on this group. As noted, victims with minor injuries or whose claims do not exceed the cap are allowed to recover fully all their economic and non-

economic damages; while those who are harmed the most recover minimal damages in comparison. The saddest incidences, perhaps, involve the youngest victims of malpractice who, like Taylor, will in all likelihood reach old age and remain wards of their parents or other family members in excess of 60 plus years. Taylor's injuries occurred when she was an infant. The cap on the jury's award also leaves Taylor's parents with no possibility of recovering any damages for the harm caused them. There lives are forever disrupted without any recompense from the tortfeasor.

In *Moore v. Mobile Infirmity Assoc.*, 592 So.2d 156 (Al. 1991), the Alabama Supreme Court invalidated a $400,000.00 cap on non-economic damages based on its finding that the link between damages caps and health care costs was remote. The *Moore* court found the State failed to show a reasonable means/end fit between caps and the asserted purpose of alleviating the effects of the alleged malpractice crisis. That court, in reviewing available empirical data, held there was insufficient evidence that the enactment of medical malpractice damages caps leads to a decrease in insurance premiums or an improvement in the availability of health care services. The *Moore* court was particularly concerned by the legislative attempt to balance the "direct and palpable burden placed upon catastrophically injured victims of medical malpractice against the indirect and speculative benefit that may be conferred on society . . ." *Id.* at 170.

In *Brannigan v. Usitalo*, 587 A.2d 1232 (N.H. 1991), the New Hampshire Supreme Court invalidated on equal protection grounds an $875,000 non-economic damages cap. That court held when a statute creates a classification interfering with the right to recover for personal injuries, the classification may not be unreasonable or arbitrary, and must have a "fair and substantial relation to the object of the legislation." *Id*. at 1234 (quoting *Carson v. Maurer*, 424 A.2d 825, 831 (N.H. 1980)

where the same court found a $250,000 cap unconstitutional). The New Hampshire Supreme Court in *Carson*, 424 A.2d 825, 837, recognized, while medical malpractice caps serve an important societal goal, it is still "unfair" to force a class of the most severely injured patients to support the entire medical industry through a reduction in damage awards.

We also find particularly interesting the series of events which have occurred in Wisconsin. In 1975, the Wisconsin legislature created the Wisconsin Patient Compensation Fund in order to stabilize the insurance market by providing a layer of coverage beyond that obtained from private insurers. Subsequently, in 1986, the Wisconsin legislature adopted a cap of $1,000,000 in non-economic damages that limited the Wisconsin PCF's liability. That cap expired in 1991. In 1995, the Wisconsin legislature adopted a cap of $350,000 (adjusted for inflation) on non-economic damages in medical malpractice cases.

In *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis.2d 573, 701 N.W.2d 440, 446 (2005), Matthew Ferdon, who was injured at birth, causing his right arm to be partially paralyzed and deformed, brought a medical malpractice claim against the doctor and hospital. Mr. Ferdon was awarded by a jury $700,000 in non-economic damages. The trial court reduced this award to the statutory limit of $410,322 (the $350,000 cap adjusted for inflation). Mr. Ferdon appealed, and the Wisconsin Court of Appeals affirmed. The Wisconsin Supreme Court reversed, declaring the cap unconstitutional under the equal protection clause of the Wisconsin Constitution. The opinion identified five legislative objectives of the statutory cap, and concluded the cap was not rationally related to achieving any of those objectives. First, the court explored "whether a rational relationship exists between the legislative objective of compensating victims fairly and the classification

of medical malpractice victims into two groups – those who suffer noneconomic damages under $350,000 and those who suffer noneconomic damages over $350,000." *Id.* at 97. The court emphasized that, as structured, "the burden of the cap falls entirely on the most seriously injured victims of medical malpractice," and accordingly, "no rational basis exists for treating the most seriously injured patients of medical malpractice less favorably than those less seriously injured." *Id.* at 98, 102.

Next, the *Ferdon* court examined whether there was a rational relationship between the cap and "[p]roviding reasonably priced medical malpractice insurance for health care providers." *Id.* at 106. Relying on several published studies, the court concluded that "medical malpractice insurance premiums are not affected by caps on noneconomic damages." *Id.* at 123.

Third, the court discussed whether the cap on non-economic damages was rationally related to the legislative function of keeping the Wisconsin PCF operating on a sound financial basis. Finding the PCF "flourished both with and without a cap," the court found "the rational basis standard requires more to justify the $350,000 cap as rationally related to the [PCF's] fiscal condition." *Id.* at 158.

Fourth, the court explored whether the cap was rationally related to the legislative objective of lowering overall health care costs. The court pointed out that "even assuming that a $350,000 cap affects medical malpractice insurance premiums and the [PCF's] assessments on health care providers, *medical malpractice are an exceedingly small portion of overall health care costs.*" *Id.* at 162 (emphasis added). The court concluded such a reduction, if it in fact existed, "would have no effect on a consumer's health care costs." *Id.* at 165.

Finally, the court in *Ferdon* examined the issue of physician flight. The court

discussed studies which indicated "that caps on noneconomic damages do not affect doctors' migration," and thus, the cap was not "rationally related to the objective of ensuring quality health care by creating an environment that health care providers are likely to move into, or less likely to move out of, in Wisconsin." *Id.* at 168, 171.

Not surprisingly, there was legislative reaction to *Ferdon*, and in 2005, the Wisconsin legislature passed a bill adopting a cap of $550,000 on non-economic damages for victims under eighteen years of age and $450,000 for adults. However, this bill was vetoed by the Governor of Wisconsin. Subsequently, the legislature passed a $750,000 cap on non-economic damages, and that bill was signed into law.

The interests which the State in this case insists are served by Louisiana's cap are the same ones many of the courts and the U.S. General Accounting Office have found lack scientific basis to correlate with actual healthcare costs and malpractice insurance premiums.

However, the State suggests somehow that Louisiana's equal protection and anti-discrimination guarantees in the Constitution offer no relief to these plaintiffs because, as found in *Butler*, the MMA provides these victims with offsetting benefits to the Act's $500,000 limitation. The State argues any discrimination against those with excessive injuries is accompanied by a *quid pro quo*: A reasonable alternative remedy. *See Bazley v.Tortorich*, 397 So.2d 475 (La.1981). Since the legislature's statutory solution to the medical malpractice problem also furthers the state purpose of compensating victims, the State urges, the cap is not constitutionally infirm. Plaintiffs maintain that this purpose is not being furthered by a cap which has existed for well over 34 years without any adjustment for inflation. They point to the declining purchasing power of the dollar during this period and inflation which has reduced the cap to one quarter of its value in 1975. Dr. Kurth testified that the

purchasing power of the $500,000 cap has dwindled to only $125,000 from the date of its enactment to the present. On the other hand, the State relies on Dr. Bauer's testimony and attempts to convince us that "because of the increasing dollar cost of medical goods *vis a vis* non-medical goods and services, and because of the increasing benefits obtained from medical care from 1975 and 1992 to the present, a severely injured victim of malpractice is actually economically and physically better off recovering medical malpractice damages now than in 1975 and 1992." As we have already noted, Dr. Bauer's conclusions are not supported by any data introduced as evidence in this record, leaving us to rely on common sense and our own experiences. We find it difficult to accept that young Taylor and her parents are better off today than they would have been if her injuries had occurred in 1974; and we are certain if Taylor and her parents could travel back in time, they would gladly refuse the increasing medical benefits the State alludes to in return for competent medical care when Taylor was first examined. The medical profession will profit for many years to come from the medical costs generated by Ms. Duhon's malpractice. The State believes it praiseworthy that Taylor's medical care costs will be paid. Taylor did not cause her injuries, a medical practitioner did, and yet, it is the medical profession which will continue to profit from this medical malpractice while the meager sum recoverable under the cap would steadily dwindle in value. It would be praiseworthy if the medical profession, like other professions, provided Taylor's future medical care *pro bono* instead of at an escalating profit.

The State also claims the cap provides an alternative remedy to the severely injured victim by assuring that healthcare providers will have malpractice insurance and these victims will recover damages and medicals from a solvent fund. As noted by Dr. Kurth and the U. S. General Accounting Office, there are no definitive studies

or evidence supporting the State's conclusion that malpractice caps translates into lower premium cost for the average health care provider. Further, the PCF introduced no data in this record to show that providing more equitable relief to the severely injured victim would compromise the stability of the fund and health care generally in this State.

The state also interposes a procedural objection to plaintiffs' constitutional challenge. The state argues, as it did below, that plaintiffs failed to specifically plead that R.S. 40:1299.41 was "overly broad" in including and limiting the liability of nurse practitioners. This failure, the State insists, bars plaintiffs from challenging the cap's constitutionality based on its application in cases involving claims lodged against nurse practitioners owning and operating clinics in this State. Despite not being convinced of the State's arguments on the constitutionality issue, the trial court accepted a belated "specificity" attack and concluded the petition was barred for "procedural insufficiency."

We do not agree that Plaintiffs petition was procedurally insufficient. Plaintiffs in their Petition for Declaratory Judgment attacked the entire Malpractice Act, specifically requesting that the court "declare the limitation on recovery imposed by the Louisiana Medical Malpractice Act, La. R.S. 40:1299.42(B) to be unconstitutional." They also alleged the "*unconstitutionality of La.R.S. 40:1299.41, et seq.*" As we noted in *Arrington v. Galen-Med, Inc.*, 04-1235 (La.App. 3 Cir. 7/6/07), 970 So.2d 540, 541-42 (emphasis added), the Louisiana Supreme Court has said:

> [O]ur Code of Civil Procedure does not require a single procedure or type of proceeding for challenging or assailing the constitutionality of a statute." [*Vallo v. Gayle Oil Co., Inc.*, 94-1238 (La. 11/20/94), 646 So.2d] at 864. The requirement that the unconstitutionality of a statute must be specially pled and the grounds for the claim particularized is a jurisprudential one designed to prompt a "contradictory hearing, wherein

all parties will be afforded the opportunity to brief and argue the issue." *Arrington*, 947 So.2d at 726 (*quoting Vallo*, 646 So.2d at 865). The ultimate purpose of this rule, as explained by the supreme court, is that "[t]he record of the proceeding could then be reviewed to determine whether the party attacking the statute sustained his or her burden of proof, and *whether the trial court attempted to construe the statute so as to preserve its constitutionality.*" *Id.*

Plaintiffs did not attack the Act's constitutionality by alleging it was overly broad by including nurse practitioners. A constitutionality attack for "over- breadth" seeks to "demonstrate from the text of the challenged statute and from actual fact that a substantial number of instances exist in which the statute cannot be applied constitutionally." *See St. Mary Anesthesia Associates, Inc. v. Hospital Service Dist. No. 2 of Parish of St. Mary*, 01-2852 (La.App. 1 Cir. 12/20/02), 836 So.2d 379, 384, *writ denied*, 03-220 (La. 3/28/03), 840 So.2d 577. The constitutional doctrine of "substantial over-breadth," is generally applied only in First Amendment cases, and requires a showing of a realistic danger that the statute will compromise recognized First Amendment protections. Over-breadth is not applicable in the instant case. Here, Plaintiffs clearly alleged "equal protection" as grounds for finding the MMA in its entirety unconstitutional as applied to severely injured patients. The trial court was not prevented from reviewing the Act to determine if all or part of it was constitutional.

The MMA has a severabilty clause in order to maintain the constitutionality of the Act in part, even if certain provisions are found not to meet constitutional muster. That precisely was what the trial court declared in its original ruling. It severed nurse practitioners as a covered group from the MMA, as is statutorily allowed, in order to maintain the constitutionality of the remainder of the Act. The pleading requirements do not mandate that Plaintiffs cite every provision of the MMA in attacking its constitutionality. It is the courts' responsibility in reviewing the MMA

to uphold all portions of the act wherever possible, except the portions that violate the constitution. The test for determining the severability of a statute's provisions is whether an unconstitutional provision in a statute is so interrelated and connected with the constitutional provisions that these provisions cannot be separated without destroying the intention manifested by the Legislature in passing the act. *Cobb v. Louisiana Bd. of Insts.*, 237 La. 315, 327, 111 So.2d 126, 130 (1958). In this case, severing nurse practitioners as a group covered by the cap will not destroy the protection afforded the principal group, namely doctors, that the legislature was attempting to protect at the time of the Act's adoption.

Still, the State argues, when the MMA was enacted the legislature intended to include within its protection nurse practitioners because registered nurses were included from the inception of the Act. We are not at all convinced that the legislature, in including registered nurses in the MMA from inception in 1975, ever intended to include nurse practitioners as qualified healthcare providers. The State argues since nurse practitioners are registered nurses, and registered nurses have always been listed as qualified health care providers, then it follows the legislature always intended to apply the cap to nurse practitioners. Although it is true nurse practitioners must be registered nurses, the statutes clearly indicate their job responsibilities are significantly different. La.R.S. 37:913(13) specifically provides that "[t]he practice of nursing or registered nursing ***shall not be deemed to include acts of medical diagnosis or medical prescriptions of therapeutic or corrective nature***." (Emphasis added.) However, that statute was amended in 1996 and now provides that "[a]dvanced practice registered nursing may include certain acts of medical diagnosis, in accordance with R.S. 37:913(8) and (9), or medical prescriptions of therapeutic or corrective nature. . ." Registered nurses are not

permitted to render medical diagnosis and prescribe medications.

## CONCLUSION

In *Arrington*, this Court instructed the State that it must do more than simply rely on prior jurisprudence upholding the constitutionality of the MMA's cap. It must present readily available evidence to show the cap continues to serve a legitimate public purpose and that a reasonable basis still exists for maintaining the discriminatory classification affecting a plaintiff's right to full recovery in medical malpractice cases. This burden, as was clearly set forth in *Sibley*, rests with the State.

The State simply did not meet its burden of establishing that the cap on damages, as it applies to nurse practitioners, is rationally related to any of the enunciated objectives set forth by the legislature when creating the cap. For the reasons set forth, we conclude the cap, to the extent it includes nurse practitioners within its ambit, violates the equal protection guarantees of the Louisiana Constitution. Benefit to the public may be a rational basis for a discriminatory classification, but the more speculative and remote the benefit, the more arbitrary is the discrimination. In this case, any correlation between the protection of nurse practitioners by including them under the purview of the cap and any corresponding benefits to the health care system has not been established. The State has not set forth any legitimate basis, under whatever level of scrutiny the constitutional issue before us is examined, for discriminating against severely and catastrophically injured victims by forcing them to shoulder the economic burden for yet another group of healthcare providers who cause them harm. Ms. Duhon owned and operated a clinic and provided medical care to the unsuspecting public without consulting with a physician and without the years of formal study required to become one; yet she held herself out as fully capable of caring for Taylor who appeared ill and in pain 32 times

-31-

at her clinic–not once did she pause to question her skills or seek advice from a physician. Her decision not to do so has caused severe harm to Taylor. She now complains a judgment against her in excess of the cap will "put her out of business." The Louisiana Association of Nurse Practitioners have also filed an Amicus brief in her defense, specifically noting "the scope of practice for Nurse Practitioners continues to expand and develop nationally and under Louisiana law." The brief recites "when NP care is compared with that of other providers such as physicians, NP patients are more satisfied with their care and say that, in addition to providing excellent healthcare, their NP excels in giving health advice" Ms. Duhon did not attend any institution of higher learning; and, her gross negligence and incompetence has caused Taylor severe harm and burdened her parents for the duration of their lives. The cap, if enforced in this case, will reward her wilful failure to follow the professional rule of her own sub-specialty which requires that she provide patient care in consultation with a physician, and she will be free to open her doors and repeat her failures in caring for another child.[4] We do not believe a rational basis exists in fact to warrant insulating her from full liability for the severe harm she has caused; and, the State has failed to provide any evidence or otherwise to convince us that a legitimate state interest is furthered by allowing Nurse Practitioners as a group to hang their shingles and to operate clinics across this state without direct supervision by a physician.

This case presents a compelling example of the most pernicious consequence of capping the liability of malpractice tortfeasors. Taylor is unfortunately a member

---

[4] Many have argued the presence of a cap serves to negate the deterrent effects of tort law. There is little incentive, if any, for healthcare providers to decrease the occurrence of malpractice incidents, because the cap serves to decrease the real value of a provider's liability, and, as such, provides extensive protection and shields negligent healthcare providers from even their grossly negligent acts. This effectively thwarts one of the key purposes the MMA was designed to achieve, the providing of fair and adequate relief to innocent malpractice victims.

of the two classes which are most discriminated against by a cap on recoverable damages: the severely injured plaintiff, and one who is also young and will have to live with her injuries and disabilities for the remainder of her life. Spread out over the expected lifetime of a young child such as Taylor, the award of $500,000 shrinks to relative insignificance, and will continue to decrease as inflation erodes the value of the allowable award. There simply is no rational reason why the most severely injured malpractice victims should be singled out to pay for special relief for a nurse practitioner who operated in derogation of her statutorily mandated duties.

The legislature, when it decided in 2009 to expand the MMA's cap to limit the liability of Nurse Practitioners, did not articulate any basis for their inclusion and the state has offered little more as evidence in this record. We will not supply this evidence for them nor remand this case for another *Sibley II* hearing. We are satisfied all the interested parties were fully apprised and aware of the constitutional issues presented—this is not the first case challenging the continued application of the cap in cases involving severely or catastrophically injured victims based on equal protection grounds.

### DECREE

For the reasons set forth above, the judgment of the trial court awarding the Olivers past medical expenses and judicial interest to be paid by the PCF on those past medical expenses is affirmed. The trial court award of future medical costs to be paid by the PCF is also affirmed. We deny Susan Duhon's peremptory exception of *res judicata*. Lastly, we conclude the cap, to the extent it includes nurse practitioners within its ambit, violates the equal protection guarantees of the Louisiana Constitution and La.R.S. 40:1299.41(A)(1), and, thus, is unconstitutional.[5]

---

[5] We note that Nurse Practitioners are still covered under the Act to the extent an injured party's damages do not exceed the cap, but that any excess liability is not covered by the Act.

Therefore, the jury's award of damages is reinstated. Costs of this appeal are assessed to Defendants.

**AFFIRMED IN PART; REVERSED IN PART; EXCEPTION OF RES JUDICATA DENIED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-439

JOE OLIVER, ET AL.

VERSES

MAGNOLIA CLINIC, ET AL.

**SAUNDERS, Judge, concurs in the result and assigns written reasons.**

In my view, nurse practitioners are not the same as registered nurses, and, thus, were not covered by the Medical Malpractice Act prior to its amendment in 2009 to specifically include them. It is clear that while a nurse practitioner can perform all the activities of a registered nurse, as in order to be a nurse practitioner one must first be a registered nurse, a registered nurse cannot perform the same activities as a nurse practitioner. Examples include diagnoses of some maladies and prescriptions of some medications.

Should one to look at the language of La.R.S. 40: 1299.41, it is clear that who is covered by the act is listed specifically rather than casting a general umbrella. For example, prior to the 2009 amendment, La.R.S. 40: 1299.41 listed certified registered nurse anesthetists and registered nurses separately. Like nurse practitioners, a certified nurse anesthetist must also be a registered nurse for one year prior to application for this licensing.

In my view, there is no need to address whether the medical malpractice act is constitutional, as nurse practitioners were not covered by the act when this unfortunate incident transpired. The writing judge addresses the constitutionality of the MMA when addressing nurse practitioners, and reaches the same result of my view regarding the seminal issue of this case, whether the MMA applies.

Moreover, I note that the MMA could not have contemplated inclusion of nurse

practitioners in its language providing coverage to registered nurses when it was created in 1975. Nurse practitioners were not licensed in Louisiana until legislation was passed in 1995, effective January 1, 1996. As such, I concur in the result of the writing judge's opinion per the written reasons as stated above.

## CA 09-439

## JOE OLIVER, ET AL.

## VERSUS

## MAGNOLIA CLINIC, ET AL.

**GREMILLION, Judge, dissents and assigns written reasons.**

Two appeals of separate judgments form the controversies at issue. Joe and Helena Oliver, individually and on behalf of their minor child, Taylor, appeal the trial court's declaratory judgment in favor of the State of Louisiana declaring the Medical Malpractice Act's limitation on recovery (the cap), La.R.S. 40:1299.42(B), constitutional and the judgment entered in their underlying tort claim. The Louisiana Patients' Compensation Fund (PCF) appeals a judgment on the Oliver's underlying tort claim. Additionally, defendant/appellant, Susan Duhon, has raised in the appeal a peremptory exception of res judicata in which she asserts that the Olivers only appealed the declaratory judgment and not the judgment on the verdict in the underlying tort claim.

Judges Cooks and Thibodeaux take pains to state that their decision is limited in its application to nurse practitioners. Judges Saunders and Painter maintain that nurse practitioners are not covered at all. However, these findings are problematic. The Olivers never assigned as error the application of the cap to nurse practitioners; rather, they want this court to declare that the cap itself, by virtue of its diminished value, is unconstitutional. We are generally precluded from considering issues not assigned as error. *See* Uniform Rules-Courts of Appeal Rules 1—3 and 2—12.4.

Additionally, Judges Cooks and Thibodeaux's reasoning is by no means limited to the circumstances of nurse practitioners. It could apply to any health care provider.

In fact, they specifically take aim at health insurers' "dividends," doctors' "incomes," and the alleged "escalating profits" of the entire "medical profession."

Furthermore, if the cap applies to nurse practitioners, its unconstitutionality necessarily affects all other qualified health care providers. I believe the cap does apply to nurse practitioners. The legislature recently enacted Act 14 of the 2009 Regular Session, amending La.R.S. 40:1299.41 effective August 15, 2009, to include nurse practitioners among those providers specifically listed in the definition of "health care providers." The significance of this amendment is that, were nurse practitioners not already covered by the act, the cap would not apply retroactively to Duhon.

The field of nursing has long been regulated in Louisiana, as it is in most states. Nurse practitioners are required to be registered nurses. La.R.S. 37:913. The MMA has long applied to registered nurses.

The legislative history of the 2009 bill persuades me that the purpose of Act 14 was simply to clarify the MMA. The original author, Representative Willmott, testified before the House Committee on Civil Law and Procedure that the bill was intended to clarify the law. In his view, nurse practitioners were already covered by the MMA, as the law requires that they be registered nurses before becoming nurse practitioners.[1] He spoke in favor of the bill from the House well and stated that its purpose was clarification.[2] Similarly, Senator Heitmeier, who moved for the bill's final passage by the Senate, advised that body that the purpose of the bill was to clarify the law.[3] I agree. Accordingly, the MMA applies to nurse practitioners

---

[1] http://house.louisiana.gov/marchive/Ram/RamMay09/0504_09_CLP.ram

[2] http://house.louisiana.gov/marchive/Ram/RamMay09/0511_09_Day09_2009RS.ram

[3] http://senate.legis.la.us/video/2009/June/060209_schramb_P2.ram

2

notwithstanding the majority's contrary finding.

Because Judge Cooks bases her ruling on the equal protection issue alone, she chooses to not address the other grounds upon which the Olivers claim the cap is unconstitutional. While I would find that the cap withstands all the Olivers' claims of unconstitutionality, I will follow Judge Cooks' lead and address only the equal protection claim.

### EQUAL PROTECTION

Judges Cooks and Thibodeaux find that the cap violates the equal protection clause of the Louisiana Constitution. I disagree. The cap forms one provision of the MMA, La.R.S. 40:1299.41, et seq., enacted by Act 817 of 1975. Its amount has not been increased. Since 1975, according to the economic experts who testified on the Olivers' behalf, the value of the cap adjusted for inflation has reduced the purchasing power of the $500,000 to the 1975 equivalent of $125,000. The Olivers argue that the effect of inflation on the value of the cap renders it a constitutionally infirm remedy.

Louisiana Constitution art. I, §2 provides:

> No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibite

Because the MMA represents a legislative classification based upon physical condition, it is not entitled to the presumption of constitutionality normally afforded a statute. *Sibley v. Bd. of Sup'rs. of La. St. Univ.*, 477 So.2d 1094 (La.1985). In the case of classifications based upon birth, age, sex, culture, physical condition or political ideas or affiliations, the burden of proving them constitutional is shifted to

3

the proponent of the classification. *Id.* The classification must be proven to substantially further an important state interest. *State v. Fleury*, 01-871 (La. 10/16/01), 799 So.2d 468.

The State and Duhon contend that the Louisiana Supreme Court has declared the cap constitutional, and that ruling is binding on this court.[4] *See Butler v. Flint Goodrich Hosp.*, 607 So.2d 517 (La.1992). Judge Cooks finds that we are not bound by the ruling of this state's supreme court, but is persuaded by the supreme courts of Wisconsin, Alabama, and New Hampshire. She premises her decision to not follow *Butler* on the fact that it was decided 18 years ago. The conditions that prevailed when it was decided still exist today: severely injured patients are ensured that their doctors will carry medical malpractice insurance; they still have access to a solvent pool of recovery in the PCF; and, all medical care and related expenses will be paid. Ironically, two of the three out-of-state opinions relied upon by Judges Cooks and Thibodeaux are older than *Butler*.

According to the evidence at trial, while the value of the general damages element of the cap has diminished in the intervening years, the element of recovery of future medical care from the PCF has dramatically increased because the costs associated with health care have risen significantly faster than inflation. My colleagues have claimed their privilege to discount this evidence, but to say this evidence does not exist in the record is simply incorrect.

The *Butler* decision involved a challenge by the patient to the cap based on the equal protection clause and the adequate remedy component of the due process clause of the state constitution. The patient did not argue that the amount of the cap

---

[4] Duhon filed a brief adopting by reference the argument of the State in its brief.

4

rendered it unconstitutional, but rather its existence. The court found that the aforementioned benefits represented a "reasonable but imperfect balance between the rights of victims and those of health care providers." *Butler*, 607 So.2d at 521. This represented a legitimate state interest. *Id*. The cap, said our supreme court, did not violate either the federal or state constitutions. *Id.*

The "quid pro quo" recognized in *Butler* still exists. The patient is guaranteed the three aforementioned benefits: greater likelihood her health care provider will carry, and be able to carry, malpractice insurance; the availability of additional recovery from a solvent pool; and, the payment of all medical and related expenses. *Id.* These benefits do not depend on the amount of the cap. If, then, the dollar value of the cap has diminished, that cannot rise to the level of a constitutional infirmity. Recourse for its adjustment lies in the legislature and not the courts.

An additional and corollary argument in the present matter is the deprivation of the loss of consortium claims of Joe and Helena Oliver. By operation of the cap, the Olivers' claims for loss of consortium are also subject to the cap. They will then recover none of the $233,000 awarded to them individually.

The cap is no less valid when applied to the Olivers' claims than it is when applied to Taylor's. The same benefits exist: the Olivers will not bear Taylor's medical expenses into the future. The trial evidence demonstrates that this benefit will far outweigh the value of the $233,000 they would receive in general damages. Accordingly, it is not an arbitrary, capricious, or unreasonable classification.

**CONCLUSION**

The cap does, indeed, fall most heavily upon those most seriously injured. However, the Louisiana Supreme Court has recognized that such a classification of

5

persons by physical condition is suspect, and nevertheless has held that an important state interest is furthered by the cap. That the cap may now be seen by many as insufficient does not negate the benefits the cap ensures all patients: greater likelihood that all health care providers will be insured; a solvent pool from which to collect; and, the payment of all future medical expenses arising from acts of medical negligence, a benefit that potentially far exceeds the value of any award of general damages.

The cap does not violate a patient's right to access to the courts or to an adequate remedy. It represents an imperfect but reasonable "quid pro quo" between qualified health care providers and their patients. There exists no constitutional guarantee of a tort victim's recovery of a particular remedy, but merely the guarantee of a right to pursue a remedy.

The cap, which has gone without adjustment for 34 years, should be adjusted by the legislature. However, while the amount of the cap is now worth substantially less than it was in 1975, it is not constitutionally infirm. Still, the legislature should consider the burden the cap places on its injured citizens and raise it. I also would respectfully suggest that the legislature index the cap in a responsible manner, which would obviate cases like the one before us now.

The critical question before this court is not whether problems with the medical malpractice cap should be addressed. The answer to that questions is clearly, "Yes." Rather, the question, I submit, that was wrongly answered by Judges Cooks and Thibodeaux is who should address the problem. The answer to that question is not this court, but the legislature.

Therefore, I would affirm the judgment of the trial court declaring the cap

6

constitutional and the jury's verdict awarding damages.